Robert H. Tyler
CA S.B.N. 179572
rtyler@tylerbursch.com
Nada N. Higuera
CA S.B.N. 299819
nhiguera@tylerbursch.com
Tyler & Bursch, LLP
25026 Las Brisas Rd.
Murrieta, California 92562
Phone: 951-600-2733
Fax: 951-600-4996

Brian Kelsey (*Pro Hac Vice* forthcoming*)*
Tennessee Bar Number 022874
bkelsey@ljc.org
Mallory Reader (*Pro Hac Vice* forthcoming)
Michigan Bar Number P84806
mreader@ljc.org
Liberty Justice Center
141 W. Jackson Blvd., Ste. 1065
Chicago, Illinois 60604
Phone: 312-637-2280
Fax: 312-263-7702
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

JUSTIN HART,

            Plaintiff,

v.

FACEBOOK, INC.; TWITTER, INC.;
VIVEK MURTHY in his official capacity as
United States Surgeon General; JOSEPH R.
BIDEN, JR. in his official capacity as
President of the United States; the
DEPARTMENT OF HEALTH AND
HUMAN SERVICES; and the OFFICE OF
MANAGEMENT AND BUDGET,

            Defendants.

Case No.  **'21 CV 1543 MMA WVG**

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

Case No.                                    1
COMPLAINT

## INTRODUCTION

1.     Defendants conspired to remove from the internet social media posts by Plaintiff, Justin Hart, because they disagreed with his viewpoint.

2.     First, Hart brings this action to defend the freedom of speech from viewpoint-based, discriminatory collusion between private social media companies and the federal government.

3.     "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995). Under the Free Speech Clause of the First Amendment, "discrimination against speech because of its message is presumed to be unconstitutional." *Id.*

4.     When the federal government admits to conspiring with social media companies to censor messages with which it disagrees, as it has in this case, both the government and the private companies are guilty of unconstitutional viewpoint discrimination: "Joint action exists where the government . . . encourages . . . unconstitutional conduct through its involvement with a private party . . . ." *Ohno v. Yasuma*, 723 F.3d 984, 996 (9th Cir. 2013) (cleaned up).

5.     This Court should declare the actions of Defendants Facebook, Inc., Twitter, Inc., President Biden, and Surgeon General Murthy unconstitutional and permanently enjoin them from monitoring, flagging, and deleting social media posts based on the viewpoints the posts espouse.

6.     Second, Defendants the Department of Health and Human Services and the Office of Management and Budget have refused to provide Hart with documents that are relevant to this lawsuit, which he has requested pursuant to the Freedom of Information Act, and this Court should order the release of those documents.

7.     Third, Defendants Facebook, Inc. and Twitter, Inc. violated Hart's right to Free Speech under the California Constitution when they deprived him of an essential and invaluable forum for speaking his mind.

8.     Fourth, Defendants Facebook, Inc. and Twitter, Inc. are liable for promissory estoppel for promising Hart the use of their social media platforms to further his business interests and then rescinding this promise after he relied on them to his detriment.

9.     Fifth, Defendant Facebook, Inc. is liable to Hart for intentional interference with a contract for knowingly denying him the ability to fulfill his contractual duty to administer the Facebook account of Donorbureau, LLC.

10.    Sixth, Defendant Facebook, Inc. is liable to Hart for negligent interference with a prospective economic advantage for knowingly disrupting the contractual relationship between Donorbureau, LLC and him by preventing him from administering the Facebook account of Donorbureau.

11.    For these reasons, Hart brings this lawsuit and seeks declaratory, injunctive, and monetary relief for the injustices he has suffered at the hands of Defendants.

## PARTIES

12.    Plaintiff, Justin Hart, is a natural person domiciled in San Diego County, California.

13.    Defendant Facebook, Inc. ("Facebook") is a corporation incorporated in Delaware with a principal place of business at 1601 Willow Road, Menlo Park, California in San Mateo County.

14.    Defendant Twitter, Inc. ("Twitter") is a corporation incorporated in Delaware with a principal place of business at 1355 Market Street, Suite 900, San Francisco, California in the City and County of San Francisco.

15.    Defendant Vivek Murthy is sued in his official capacity as the Surgeon General of the United States. In that role, he directs the office of the Surgeon General.

16.    Defendant Joseph R. Biden, Jr. is sued in his official capacity as the President of the United States. In that role, he directs the executive branch of the federal government, including White House staff.

17.    Defendant the Department of Health and Human Services ("HHS") is an agency within the executive branch of the federal government which maintains agency

records for the Surgeon General of the United States, his office, and others within the department.

18.     Defendant the Office of Management and Budget ("OMB") is an agency within the Executive Office of the President which maintains agency records for the President of the United States, his staff, and others within the executive branch.

## JURISDICTION AND VENUE

19.     This case raises federal claims under the First Amendment of the United States Constitution and the Freedom of Information Act, 5 U.S.C. § 552; therefore, the Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

20.     This Court has jurisdiction to issue injunctive relief to protect constitutional rights. *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

21.     The Court has jurisdiction to issue declaratory relief pursuant to 28 U.S.C. § 2201 and to order further necessary or proper relief based on a declaratory judgment or decree pursuant to 28 U.S.C. § 2202.

22.     The Court has jurisdiction to order the production of agency records improperly withheld pursuant to 5 U.S.C. § 552(a)(4)(B).

23.     The Court has supplemental jurisdiction over the California state law claims pursuant to 28 U.S.C. § 1367.

24.     The Court has personal jurisdiction over Defendants Murthy, Biden, HHS, and OMB because they are officers or agencies of the United States.

25.     The Court has personal jurisdiction over Defendants Facebook and Twitter because they maintain their principal places of business in California.

26.     Venue must lie in this district under 5 U.S.C. § 552(a)(4)(B) with regards to the claim under the Freedom of Information Act because Hart resides in San Diego County, California. Venue lies in this district under 28 U.S.C. § 1391(e)(1) and (b)(2) because Defendants Murthy, Biden, HHS, and OMB are officers or agencies of the United States; a substantial part of the events giving rising to the claims occurred here, where Hart accesses

his Facebook and Twitter accounts; Hart resides here; and no real property is involved in the action.

## FACTS

### *Deplatforming:*

1.     On or around July 13, 2021, Hart posted to his personal Facebook page a graphic entitled, "Masking Children is Impractical and Not Backed by Research or Real World Data."

2.     Below is a photo of the graphic in the post:



3.     The graphic Hart posted is science-based and contains footnotes to scientific evidence supporting its claims.

4.     Facebook flagged the above post on or around July 13, 2021, with the following notice:

> **You can't post or comment for 3 days.**
>
> This is because you previously posted something that didn't follow our Community Standards.
>
> This post goes against our standards on misinformation that could cause physical harm, so only you can see it.
>
> **Learn more about updates to our standards.**

5.     On or around July 18, 2021, Hart posted to his personal Twitter page a tweet that read:

> So the CDC just reported that 70% of those who came down with #COvId19 symptoms had been wearing a mask. We know that masks don't protect you… but at some point you have to wonder if they are PART of the problem.

6.     Twitter locked Hart's account on or around July 18, 2021, with the following notice sent to his email:

> **Hi Justin Hart,**
>
> **Your Account, @justin_hart has been locked for violating the Twitter Rules.**
>
> Specifically for: Violating the policy on spreading misleading and potentially harmful information related to COVID-19.

### *Biden and Murthy:*

7.     Within days of these two removals, the administration of Defendant Biden revealed publicly that it is directing social media companies to remove posts it deems to be spreading misinformation regarding COVID-19.

8.     On July 15, 2021, at a White House Press Conference, Defendant Murthy stated, "We're asking [our technology companies] to consistently take action against misinformation super-spreaders on their platforms."[1]

9.     The White House revealed that a team of government employees are actively researching and tracking social media posts with which it disagrees and relaying those posts to social media companies with instructions to take them down.

---

[1] Vivek H. Murthy, White House Press Briefing (July 15, 2021), transcript available at https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/15/press-briefing-by-press-secretary-jen-psaki-and-surgeon-general-dr-vivek-h-murthy-july-15-2021/ (last visited Aug. 18, 2021).

10.     White House Press Secretary Jen Psaki admitted, "We've increased disinformation research and tracking within the Surgeon General's office. We're flagging problematic posts for Facebook that spread disinformation."[2]

11.     Psaki also revealed that the White House effort to suppress free speech reaches all the way to the level of senior staff for Defendant Biden.

12.     Psaki gave a glimpse of how the scheme works: "we are in regular touch with these social media platforms, and those engagements typically happen through members of our senior staff, but also members of our COVID-19 team . . . ." [3]

13.     The next day she revealed that the far-reaching effort targeted multiple posts on multiple social media sites: "You shouldn't be banned from one platform and not others."[4]

14.     Defendants Biden and Murthy directed four key changes for social media platforms. The first is that the companies "measure and publicly share the impact of misinformation on their platform."[5]

15.     Second, Biden and Murthy directed companies to "create a robust enforcement strategy that bridges their properties and provides transparency about the rules."[6]

16.     Third, Biden and Murthy stressed that "it's important to take faster action against harmful posts" because "information travels quite quickly on social media

---

[2] Jen Psaki, White House Press Briefing (July 15, 2021), transcript available at https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/15/press-briefing-by-press-secretary-jen-psaki-and-surgeon-general-dr-vivek-h-murthy-july-15-2021/ (last visited Aug. 18, 2021).

[3] *Id.*

[4] Jen Psaki, White House Press Briefing (July 16, 2021), transcript available at https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/16/press-briefing-by-press-secretary-jen-psaki-july-16-2021/ (last visited Aug. 18, 2021).

[5] Psaki, *supra* note 2.

[6] *Id.*

platforms; sometimes it's not accurate. And Facebook needs to move more quickly to remove harmful, violative posts[.]"[7]

17.     Fourth, Biden and Murthy directed Facebook to "promote quality information in their feed algorithm."[8]

18.     At the direction of Biden, Murthy created and published an entire 22-page Advisory with instructions on how social media companies should remove posts with which Murthy and Biden disagree.[9]

19.     Biden further threatened social media companies who do not comply with his directives by publicly shaming and humiliating them, stating, "They're killing people."[10]

20.     On information and belief, Defendants Biden and Murthy directed Defendants Facebook and Twitter to remove Hart's social media posts because they disagreed with the viewpoints he espoused in them and conspired with Facebook and Twitter to do so.

### *Facebook:*

21.     Defendant Facebook is one of the most popular social media sites. It boasts "more than 2.8 billion monthly users worldwide," who use it for both business and pleasure.[11] Almost 70% of Americans use Facebook in some capacity.[12] Of these users,

---

[7] *Id.*

[8] *Id.*

[9] Vivek H. Murthy, *Confronting Health Misinformation: The U.S. Surgeon General's Advisory on Building a Healthy Information Enviornment* (2021), available at https://www.hhs.gov/sites/default/files/surgeon-general-misinformation-advisory.pdf (last visited Aug. 18, 2021).

[10] Lauren Egan, *"They're killing people": Biden blames Facebook, other social media for allowing Covid misinformation*, NBC News (July 16, 2021, 4:10 PM), available at https://www.nbcnews.com/politics/white-house/they-re-killing-people-biden-blames-facebook-other-social-media-n1274232 (last visited Aug. 18, 2021).

[11] John Gramlich, *10 facts about Americans and Facebook*, Pew Research Center (June 1, 2021), available at https://www.pewresearch.org/fact-tank/2021/06/01/facts-about-americans-and-facebook/) (last visited Aug. 18, 2021).

[12] *Id.*

70% visit Facebook daily.[13]

22.     Facebook's services involve creating a sort of personal website for its users who can post pictures of themselves and others, create posts on their wall where they can "debate religion and politics with their friends and neighbors or share vacation photos." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017). These posts can also include links to news articles and videos. Other users can post comments on a user's posts and, thereby, have a dialogue with one other. Users may also send each other direct messages through Facebook's Messenger feature.

23.     Given this tremendous opportunity to network and speak with other people throughout the United States and even the world, users frequently use it to promote their business. "There are over 60 million active business [p]ages" on Facebook.[14] Millions of businesses pay to be active advertisers.[15]

24.     Facebook's hosting of advertisements is very lucrative for it. In 2018, it generated a total of $55.8 billion in revenue, and 99% of that came from ads on Facebook and other platforms that it owns, such as Instagram.[16]

25.     Facebook's terms of service invites businesses to use its services to "connect with [other people], build communities, and grow businesses."[17] Facebook describes its

---

[13] *Id.*

[14] Kit Smith, *53 Incredible Facebook Statistics and Facts*, Brandwatch (June 1, 2019), available at https://www.brandwatch.com/blog/facebook-statistics/ (last visited Aug. 18, 2021).

[15] *Id.*

[16] Erin Black, *How Facebook makes money by targeting ads directly to you*, CNBC (Apr. 2, 2019), available at https://www.cnbc.com/2019/04/02/how-facebook-instagram-whatsapp-and-messenger-make-money.html?__source=facebook%7Cmain&fbclid=IwAR05sCPLjY61T3UOfYNvQQZwOiMY64mJsnMQ0Lu4UNYqXkaXa1FUPpn1Huo (last visited Aug. 18, 2021).

[17] Terms of Service, Facebook, available at https://www.facebook.com/terms.php (last revised Oct. 22, 2020) (last visited July 19, 2021).

services as "[e]mpower[ing] you to express yourself and communicate about what matters to you."[18]

26.     The terms of service require users to follow its "Community Standards."[19] Those standards state that Facebook is "a service for more than two billion people to freely express themselves across countries and cultures and in dozens of languages."[20] They go on to state, "To ensure that everyone's voice is valued, we take great care to craft policies that are inclusive of different views and beliefs, in particular those of people and communities that might otherwise be overlooked or marginalized."[21]

27.     The limits on this pro-free speech stance include abstract categories such as "Violence and Criminal Behavior," "Safety" (which includes "Suicide and Self-Injury," "Child Sexual Exploitation, Abuse, and Nudity," "Sexual Exploitation of Adults," "Bullying and Harassment," "Human Exploitation," and "Privacy Violations and Image Privacy Rights), "Objectionable Content" (which includes "Hate Speech," "Violent and Graphic Content," "Adult Nudity and Sexual Activity," and "Sexual Solicitation"), "Integrity and Authenticity," (which includes "Account Integrity and Authentic Identity," "Spam," "Cybersecurity," "Inauthentic Behavior," "False News," "Manipulated Media," and "Memorialization"), and "Respecting Intellectual Property." For the "False News" sub-category, Facebook states that "we do not remove false news from Facebook but we significantly reduce its distribution by showing it lower in News Feed."[22]

28.     At no point in the terms of service or Community Standards does Facebook prohibit viewpoints that oppose making children wear masks.

_____

[18] *Id.*

[19] *Id.*

[20]     Community     Standards,     Facebook,     available     at https://www.facebook.com/communitystandards/ (last visited July 19, 2021).

[21] *Id.*

[22] *Id.*

29.     Plaintiff, Justin Hart, is an executive consultant with over 25 years' experience creating data-driven solutions for Fortune 500 companies and presidential campaigns alike. He is the Chief Data Analyst and founder of RationalGround.com, which helps companies, public policy officials, and parents gauge the impact of COVID-19 across the country.

30.     He has used Facebook's services since 2007. He has roughly 1,700 Facebook users who follow his account, and roughly 3,000 Facebook friends.

31.     He uses his Facebook account as a feeder for his other social media accounts, as a networking tool for his consulting business, and as a promotion for his online website, RationalGround.com, where he sells subscriptions to his articles and research on COVID-19 and the government's response to it.

32.     Given Hart's use of Facebook for his business, he has bought ads on Facebook that promote his consulting business. Over the years, Hart has spent thousands of dollars on Facebook advertisements.

33.     Hart has also bought ads for his consulting clients over the years, spending tens of thousands of dollars.

34.     On his website, RationalGround.com, Hart offers some of his articles exclusively to subscribers. His subscriptions generate thousands of dollars per month.

35.     On or around September 15, 2020, Facebook issued Hart a warning regarding a post he had made in July 2020 which had contained a video of protestors attempting to tear down a statute of Christopher Columbus in Chicago. Hart's comment on the post read: "BLM/SJW rally in Chicago to tear down the statue of Christopher Columbus. Cops defending the place as hundreds of 'peaceful' protestors throw bottles, cans, canes, rocks... But the best thing about this video is the 2 F's NOT given by these officers. Gotta love Chicago." Inexplicably, the warning claimed, "False information about COVID-19 found in your post. A notice was added to your post."

36.     On or around September 25, 2020, Facebook claimed that a recent post by Hart violated its Community Standards and banned him from advertising for 30 days and from going "live" for 30 days. Going "live" on Facebook allows a user to have a video call with

followers in real-time. The post stated, "'Spotify seems like a great place to work!' – Joseph Goebbels."

37.     On April 23, 2021, Facebook restricted the ability of Hart to post or comment for 24 hours because it claimed the following three posts violated its Community Standards:

        a.     On or around April 14, 2021, Hart created a post on Facebook stating, "If you ever want to know where your BLM donation is going – the co-founder 'trained Marxist' Patrisee Cullars – just bought this amazing home in LA" and it included a link to a picture of the house.

        b.     That same day, a second post of his was removed from Facebook.

        c.     On April 23, 2021, he created a post stating that: "This is the truth: Covid is almost gone in America. Hospitals are literally empty. Every willing senior has already been vaccinated. In a few weeks every willing adult can be…

38.     Losing the ability to connect with people through his Facebook account has harmed Hart's online business and work to help others. He is also suffering injury because he serves as the administrator of at least one of his client's Facebook pages. While Hart's personal account is suspended, he cannot service this account.

39.     Facebook's standards for censorship are constantly shifting.

40.     For example, since early 2020, there has been widespread debate over whether COVID-19 was made by humans in a lab in Wuhan, China and escaped from the lab or whether it started naturally through animal to human transmission. Despite this debate, in February 2020, Facebook announced it would remove posts that suggested the virus was man-made, stating that the theory had been debunked by public health officials.[23] But in May 2021, after Biden acknowledged the possibility of the theory, Facebook reversed its

---

[23] Peter Suciu, *Social Media About Face: Facebook Won't Remove Claims Covid Was Man-Made*, Forbes (May 28, 2021, 3:39 PM), available at https://www.forbes.com/sites/petersuciu/2021/05/28/social-media-about-face-facebook-wont-remove-claims-covid-was-man-made/?sh=d21e05c6aa1a (last visited Aug. 18, 2021).

policy and announced that it would no longer remove posts expressing that viewpoint.[24] Therefore, Facebook is stifling the free debate of scientific theories by taking its directions from the federal government.

### *Twitter:*

41.    Defendant Twitter is also a popular social media site; more than one in five adult Americans use the platform.[25] Of these users, 46% visit Twitter daily.[26]

42.    Twitter's services involve creating a personal profile from which its users can "tweet"—meaning post messages, photos, and weblinks to their feed for other users to see. Users can "like," repost, or reply to other users' tweets.

43.    Twitter allows users to have a dialogue on a variety of issues, including topics of national importance. 42% of U.S. adults on Twitter say they use the site to discuss politics.[27] Twitter is known for being "one of the social media sites with the most news-focused users."[28] 71% of adult Twitter users in the U.S. use the site to get news.[29]

44.    "The Twitter Rules" proclaim that "Twitter's purpose is to serve the public conversation."[30]

---

[24] Donie O'Sullivan & Jordan Valinsky, *Facebook will no longer remove claims that Covid-19 was man-made*, CNN Business (May 27, 2021, 12:16 PM), available at https://www.cnn.com/2021/05/27/tech/facebook-covid-origin-claims-removal/index.html (last visited Aug.18, 2021).

[25] Brooke Auxier & Monica Anderson, *Social Media Use in 2021*, Pew Research Center (April 7, 2021), available at https://www.pewresearch.org/internet/2021/04/07/social-media-use-in-2021/ (last visited July 19, 2021).

[26] *Id.*

[27] Adam Hughes & Stefan Wojcik, *10 facts about Americans and Twitter*, Pew Research Center (Aug. 2, 2019), available at https://www.pewresearch.org/fact-tank/2019/08/02/10-facts-about-americans-and-twitter/ (last visited July 19, 2021).

[28] *Id.*

[29] *Id.*

[30] The Twitter Rules, Twitter, available at https://help.twitter.com/en/rules-and-policies/twitter-rules (last visited Aug. 19, 2021).

45.     The limitations on that "public conversation" include Tweets that threaten or glorify violence or terrorism, sexually exploit children, abuse or harass other people, promote self-harm or suicide, show excessively gory media or adult content within live videos or profile photos, or serve any unlawful purpose.[31]

46.     At no point in the terms of service or Twitter Rules does Twitter prohibit viewpoints that oppose wearing masks.

47.     Hart has used Twitter's services since 2007.

48.     He uses his Twitter account as a feeder for his other social media accounts, as a networking tool for his consulting business, and as a promotion of his online website, RationalGround.com, where he sells subscriptions to his articles and research on COVID-19 and the government's response to it.

49.     Hart has purchased ads on Twitter to promote his consulting business. Over the years, he has spent thousands of dollars on Twitter ads. Hart planned to increase his use of Twitter advertising, but he was denied from doing so by Twitter.

50.     Losing the ability to communicate with people through his Twitter account has harmed his online business.

## COUNT I – Free Speech

**Murthy, Biden, Facebook, and Twitter violated the Free Speech clause of the First Amendment when they acted jointly to remove Hart's social media posts and block him from using his accounts.**

51.     The allegations in the preceding paragraphs are incorporated herein by reference.

52.     "The First Amendment is a kind of Equal Protection Clause for ideas." *Barr v. Am. Ass'n of Political Consultants*, 140 S. Ct. 2335, 2354 (2020) (plurality). A government violates this promise of equal treatment for ideas when it engages in viewpoint discrimination. *Rosenberger*, 515 U.S. at 819.

---

[31] *Id.*

53. Murthy and Biden engaged in viewpoint discrimination when they directed Facebook and Twitter to remove social media posts like those of Hart that contained a viewpoint on COVID-19 that did not fit with their own political narrative.

54. Private companies engage in state action when they work with government officials to deprive individuals of their constitutional rights. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 942 (1982).

55. "The Supreme Court has articulated four tests for determining whether a non-governmental person's actions amount to state action: (1) the public function test; (2) the joint action test; (3) the state compulsion test; and (4) the governmental nexus test." *Ohno v. Yasuma*, 723 F.3d 984, 995 (9th Cir. 2013) (cleaned up).

56. "Joint action exists where the government affirms, authorizes, encourages, or facilitates unconstitutional conduct through its involvement with a private party." *Ohno v. Yasuma*, 723 F.3d 984, 996 (9th Cir. 2013) (cleaned up).

57. The Ninth Circuit finds joint action when "state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1140 (9th Cir. 2012) (cleaned up). "This requirement can be satisfied either by proving the existence of a conspiracy or by showing that the private party was a willful participant in joint action with the State or its agents." *Id.* (cleaned up). "Particularly relevant here is the maxim that if the state knowingly accepts the benefits derived from unconstitutional behavior, then the conduct can be treated as state action." *Id.* (cleaned up).

58. Facebook and Twitter engaged in state action when they removed posts like Hart's at the request of Murthy and Biden based on the viewpoint of those posts.

59. Facebook and Twitter worked in concert and/or conspiracy with Murthy and Biden to deprive Hart of his First Amendment right to Free Speech.

60. Murthy and Biden affirmed, authorized, encouraged, and/or facilitated Facebook and Twitter's unconstitutional conduct of censorship.

61.     Facebook and Twitter were either willful participants when they removed posts based on their viewpoint at the direction of Murthy and Biden or they were subject to government compulsion, either of which amounts to state action.

62.     Murthy and Biden knowingly accepted the benefits of censored speech derived from the unconstitutional behavior of Facebook and Twitter in removing posts based on a viewpoint with which Murthy and Biden disagreed.

63.     Facebook and Twitter now require that Hart and other users express a government-approved viewpoint to use their platforms.

64.     Hart is entitled to declaratory and injunctive relief against Murthy and Biden for violating his right to Free Speech.

65.     Hart is entitled to declaratory and injunctive relief as well as compensatory and nominal damages from Facebook and Twitter for violating his right to Free Speech.

## COUNT II – Freedom of Information Act

**HHS and OMB violated the Freedom of Information Act when they failed to respond to Plaintiff's records request within the statutory timeframe.**

66.     The allegations in the preceding paragraphs are incorporated herein by reference.

67.     Justin Hart, through his counsel, submitted a request for documents pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, to both the Department of Health and Human Services and the Office of Management and Budget on July 22, 2021.

68.     Under the FOIA, agencies are granted twenty (20) business days to respond to a request for records. 5 U.S.C. § 552(a)(6)(A)(i).

69.     To date, it has been twenty-eight (28) business days since Hart requested the documents. Neither HHS nor OMB have provided the records requested by Hart, nor have they provided a denial of his records requests.

70.     The only response received was from OMB on August 2, 2021, denying expedited processing of the records request.

71.     When an agency fails to respond to the requester within the statutory time limit, the requester "shall be deemed to have exhausted his administrative remedies[.]" 5 U.S.C. § 553(a)(6)(C)(i).

72.     Therefore, Hart may lodge this Complaint against HHS and OMB.

73.     HHS and OMB have improperly withheld the requested records from Hart.

74.     Hart is entitled to a judgment from this Court ordering HHS and OMB immediately to produce the records he requested.

## COUNT III – California Free Speech

**Facebook and Twitter violated the Free Speech clause of the California Constitution when they blocked Hart's speech.**

75.     Facebook and Twitter are common carriers of information and are not able to suppress speech based on viewpoint.

76.     In *Pruneyard Shopping Center*, the California Supreme Court recognized that the suburban shopping center—even ones that are privately owned—are an "essential and invaluable forum for exercising" speech rights. 592 P.2d 341, 347 (Cal. 1979). The court reasoned that shopping centers are where most people "spend the most significant amount of [their] time in suburban areas where [their] needs and wants are satisfied" because "shopping centers provide the location, goods, and services to satisfy [their] needs and wants." *Id.* at 345.

77.     The U.S. Supreme Court made a similar observation about the internet in *Packingham*, 137 S. Ct. at 1735. There, the Court compared social media to a "quintessential forum" for engaging in speech such as "a street or park." It further found that the most important forum today for speech is "cyberspace—the 'vast democratic forums of the Internet' in general . . . and social media in particular." *Id.* (quoting *Reno v. American Civil Liberties Union*, 521 U. S. 844, 868, 117 S. Ct. 2329, 138 L. Ed. 2d 874 (1997)). Social media platforms are the modern-day town square.

78.    Because Facebook and Twitter provide an essential and invaluable forum for exercising Hart's right to Free Speech under the California Constitution, they violated such right when they removed Hart's posts and suspended his ability to speak on their platforms.

79.    Hart is entitled to declaratory and injunctive relief as well as compensatory and nominal damages from Facebook and Twitter for violating his right to Free Speech under the California Constitution.

### COUNT IV - Promissory Estoppel

**Facebook and Twitter committed promissory estoppel by not fulfilling their promise for Hart to use their platform for his business.**

80.    The allegations in the preceding paragraphs are incorporated herein by reference.

81.    Facebook and Twitter made "a clear and unambiguous promise" to Hart that he could use their services to communicate and network with other Facebook and Twitter users. *Bushell v. JPMorgan Chase Bank, N.A.*, 163 Cal. Rptr. 3d 539, 550 (Cal. Ct. App. 2013).

82.    Facebook and Twitter did not caveat this promise by announcing that they would censor speech opposing masks.

83.    Hart engaged in "reasonable, foreseeable and detrimental reliance" on Facebook's and Twitter's promise when he started using their services to speak with and network with other Facebook and Twitter users to promote his business. *Bushell*, 163 Cal. Rptr. 3d at 550.

84.    Hart engaged in "reasonable, foreseeable and detrimental reliance" on Facebook's promise when he invested substantial sums of money to advertise on Facebook and Twitter. *Id.*

85.    Facebook's and Twitter's removal and flagging of Hart's posts and suspension of his account for engaging in speech caused his reliance on their promises to be to the detriment of his business, finances, and reputation.

86.     As the result of this detrimental reliance, Hart suffered monetary and non-monetary damages.

87.     Hart is entitled to monetary relief from Facebook and Twitter for committing the tort of promissory estoppel.

**COUNT V - Intentional Interference with a Contract**

**Facebook committed intentional interference with a contract by interfering with Hart's contract with Donorbureau, LLC.**

88.     The allegations in the preceding paragraphs are incorporated herein by reference.

89.     To establish a claim of intentional interference with a contractual relationship, the claimant must show (1) a valid contract between claimant and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. *Davis v. Nadrich*, 94 Cal. Rptr. 3d 414, 421 (Cal. Ct. App. 2009).

90.     California law does not require that the defendant act with the specific intent to interfere. *See id.* at 422; *Quelimane Co. v. Stewart Title Guaranty Co.*, 960 P.2d 513 (1998). The tort is applicable if the defendant knows that the interference is substantially certain or certain to happen as a result of defendant's actions. *Nadrich*, 94 Cal. Rptr. 3d at 422.

91.     Hart maintains a valid employment contract with Donorbureau, LLC ("Donorbureau"), a Virginia-based limited liability company.

92.     As part of his employment contract, Hart's job duties include serving as an Administrator on the Donorbureau Facebook account, so he can post content to the site and make other changes in an effort to increase Donorbureau's revenue.

93.     Facebook has knowledge of the relationship between Hart and Donorbureau because it has actual notice that Hart serves as an Administrator for the Donorbureau account.

94. Facebook intentionally suspended Hart's use of his personal Facebook account, and Facebook knew and intended that such action would prevent Hart from doing his work as an Administrator on the Donorbureau account.

95. Therefore, Facebook intentionally interfered with Hart's contract with Donorbureau.

96. Not being able to service Donorbureau's Facebook page placed Hart in breach of his contract with Donorbureau.

97. Hart suffered and is suffering monetary damage for not being able to fulfill his social media duties to Donorbureau.

98. Hart is entitled to monetary relief from Facebook for intentionally interfering with his contract with Donorbureau.

## COUNT VI - Negligent Interference with a Prospective Economic Advantage

**Facebook committed negligent interference with a prospective economic advantage by interfering with Hart's contract with Donorbureau, LLC.**

99. The allegations in the preceding paragraphs are incorporated herein by reference.

100. To establish a claim of negligent interference with a prospective economic advantage, a claimant must show (1) the existence of a valid contractual relationship between the plaintiff and a third party containing the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge, actual or construed, of the relationship; (3) the defendant's knowledge, actual or construed, that the relationship would be disrupted if the defendant failed to act with reasonable care; (4) the defendant's failure to act with reasonable care; (5) actual disruption of the relationship; and (6) resulting economic harm. *Nelson v. Tucker Ellis, LLP*, 262 Cal. Rptr. 3d 250, 264 n.5 (Cal. App. Ct. 2020).

101. Hart maintains a valid employment contract with Donorbureau, LLC, a Virginia-based limited liability company.

102.   As part of his employment contract, Hart's job duties include serving as an Administrator on the Donorbureau Facebook account, so he can post content to the site and make other changes in an effort to increase Donorbureau's revenue.

103.   Hart has a probability of future economic benefit by fulfilling the terms of his employment contract with Donorbureau.

104.   Facebook has knowledge of the relationship between Hart and Donorbureau because it has actual notice that Hart serves as an Administrator for the Donorbureau account.

105.   When Facebook suspended Hart's use of his personal Facebook account, it knew or should have known that Hart's work as an Administrator on the Donorbureau account and his relationship with Donorbureau would be disrupted as a result of its negligent actions.

106.   In not providing Hart any avenue to access the Donorbureau account, Facebook failed to act with reasonable care.

107.   Facebook's act of suspension caused an actual disruption in the relationship between Hart and Donorbureau because he could not post content to the site or make other changes in his work to increase Donorbureau's revenue.

108.   Therefore, Facebook negligently interfered with Hart's prospective economic advantage from his contractual relationship with Donorbureau.

109.   Hart suffered and is suffering monetary damage for not being able to fulfill his social media duties to Donorbureau.

110.   Hart is entitled to monetary relief from Facebook for negligently interfering with the prospective economic advantage resulting from his contract with Donorbureau.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court enter judgment in his favor on every claim set forth above and award him the following relief:

A.   Declare that the actions of Murthy, Biden, Facebook, and Twitter constitute a violation of the Free Speech clause by denying Hart the ability to speak on Facebook and Twitter;

B.   Enjoin Murthy and Biden from directing social media companies to censor information with which Murthy and Biden disagree;

C.   Enjoin Facebook and Twitter from removing or suspending posts at the direction of Murthy and Biden;

D.   Enjoin Murthy and Biden from directing social media companies to censor Hart's speech;

E.   Enjoin Facebook and Twitter from removing Hart's posts or suspending his ability to post because they disagree with the content of his posts regarding masks, COVID-19, or other highly debated topics of the day;

F.   Order OMB and HHS immediately to produce the records Hart requested pursuant to the Freedom of Information Act;

G.   Award Hart attorneys' fees and costs, pursuant to 5 U.S.C. § 552(a)(4)(E);

H.   Declare that the actions of Facebook and Twitter constitute a violation of the Free Speech clause of the California Constitution by denying Hart the ability to speak on Facebook and Twitter;

I.   Award Hart nominal damages of $1 each from Facebook and Twitter for suffering a violation of his federal and state free speech rights and for suffering damages in California tort law;

J.   Award Hart compensatory damages in the amount of his past, present, and future lost income resulting from Facebook's and Twitter's actions of promissory estoppel and resulting from Facebook's intentional interference with a contract and negligent interference with a prospective economic advantage;

K.   Award Hart compensatory damages in the amount of a return of the money he spent on Facebook and Twitter advertisements because of Facebook's and Twitter's actions

of promissory estoppel and Facebook's intentional interference with a contract and negligent interference with a prospective economic advantage;

L.     Award Hart compensatory damages in an amount to fully compensate him for the time he spent building a following on Facebook and Twitter that has now been wasted by Facebook's and Twitter's actions of promissory estoppel and Facebook's intentional interference with a contract and negligent interference with a prospective economic advantage;

M.     Award Hart compensatory damages in the amount of the harm to his reputation resulting from Facebook's and Twitter's actions of promissory estoppel and resulting from Facebook's intentional interference with a contract and negligent interference with a prospective economic advantage;

N.     Award any further relief to which Hart may be entitled, including attorneys' fees and costs.

Dated: August 31, 2021                    Respectfully submitted,

                                          s/ Robert Tyler_____
                                          Robert H. Tyler, CA S.B.N. 179572
                                          rtyler@tylerbursch.com
                                          Nada N. Higuera, CA S.B.N. 299819
                                          nhiguera@tylerbursch.com
                                          Tyler & Bursch, LLP
                                          25026 Las Brisas Rd.
                                          Murrieta, California 92562
                                          Phone: 951-600-2733
                                          Fax: 951-600-4996


                                          Brian K. Kelsey (*Pro Hac Vice* forthcoming*)*
                                          Tennessee Bar Number 022874
                                          bkelsey@ljc.org
                                          Mallory Reader (*Pro Hac Vice* forthcoming)
                                          Michigan Bar Number P84806
                                          mreader@ljc.org

Liberty Justice Center
141 W. Jackson Blvd., Ste. 1065
Chicago, Illinois 60604
Phone: 312-637-2280
Fax: 312-263-7702

*Attorneys for Plaintiff*