BRIAN NETTER
Deputy Assistant Attorney General
STEPHANIE HINDS
United States Attorney
ERIC BECKENHAUER
Assistant Director, Federal Programs Branch
KUNTAL CHOLERA
Trial Counsel
U.S. Department of Justice

Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Tel.:    (202) 305-8645
Fax:    (202) 616-8470
*Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

JUSTIN HART,

               Plaintiff,

        v.

FACEBOOK, INC., *et al.*,

              Defendants.

No.  3:22-cv-00737-CRB

**DEFENDANTS' NOTICE OF MOTION
AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND
AUTHORITIES**

Date:       April 21, 2022
Time:      2:00 p.m.

1

## TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION TO DISMISS ............................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................... 1

Introduction ............................................................................................................................. 1

Background .............................................................................................................................. 4

    I.      Misinformation on Social Media. ........................................................................... 4

    II.     Social Media Companies' Efforts to Stem COVID-19 Misinformation. ................ 5

    III.    The Surgeon General's Advisory on Building a Healthy Information
          Environment. .......................................................................................................... 6

    IV.    Facebook's and Twitter's Alleged Response to Plaintiff's Social Media
         Posts .................................................................................................................... 9

    V.     This Action. ........................................................................................................... 10

Standard of Review .............................................................................................................. 10

Argument ............................................................................................................................... 11

    I.      Plaintiff lacks standing to assert its First Amendment claim against the
         Federal Defendants. ............................................................................................... 11

    II.     Plaintiff fails to state a First Amendment claim against the Federal
         Defendants. ........................................................................................................... 15

         A.    Plaintiff fails to show coercion or a similar degree of
              encouragement. ........................................................................................ 17

         B.    Plaintiff fails to show that the Federal Defendants dictated
              Facebook's or Twitter's actions ............................................................. 17

Conclusion ............................................................................................................................. 22

i

Defs' Motion to Dismiss; Memo.
No.  3:22-cv-00737-CRB

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) .................................................................................................... 11, 18, 21

*Association of American Physicians ("AAPS") & Surgeons v. Schiff*,
 518 F. Supp. 3d 505 (D.D.C. 2021) ................................................................................... 14, 15

*Blum v. Yaretsky*,
 457 U.S. 991 (1982) .................................................................................................... *passim*

*Brunette v. Humane Soc'y of Ventura Cty.*,
 294 F.3d 1205 (9th Cir. 2002);
 *as ameded on denial of reh'g and reh'g en banc* (Aug. 23, 2002) ........................................... 16

*Children's Health Deense v. Facebook*,
 Case No. 20-CV-05787-SI, 2021 WL 2662064 (N.D. Cal. June 29, 2021) ....................... 20, 21

*City of Los Angeles v. Lyons*,
 461 U.S. 95 (1983) .................................................................................................... 11, 12

*Cook v. Brewer*,
 637 F.3d 1002 (9th Cir. 2011) .......................................................................................... 11

*Florer v. Congregation Pidyon Shevuyim, N.A.*,
 639 F.3d 916 (9th Cir. 2011) .......................................................................................... 17

*Franklin v. Massachusetts*,
 505 U.S. 788 (1992) .................................................................................................... 22

*FW/PBS Inc. v. Dallas*,
 493 U.S. 215 (1990) .................................................................................................... 11

*Idaho Conservation League v. Mumma*,
 956 F.2d 1508 (9th Cir. 1992) .......................................................................................... 12

*Jackson v. Metro. Edison Co.*,
 419 U.S. 345 (1974) .................................................................................................... 16

*Lazy Y Ranch Ltd. v. Behrens*,
 546 F.3d 580 (9th Cir. 2008) .......................................................................................... 22

*Lee v. City of Los Angeles*,
 250 F.3d 668 (9th Cir. 2001) ............................................................................................ 6

*Leite v. Crane Co.*,
 749 F.3d 1117 (9th Cir. 2014) .......................................................................................... 10

*Lloyd Corp., Ltd. v. Tanner*,
 407 U.S. 551 (1972) .................................................................................................... 16

Defs' Motion to Dismiss; Memo.
No.  3:22-cv-00737-CRB

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ........................................................................................................ 12

*Mathis v. Pac. Gas & Elec. Co.*,
   75 F.3d 498 (9th Cir. 1996) ........................................................................................ 16, 17

*Nw. Requirements Utilities v. F.E.R.C.*,
   798 F.3d 796 (9th Cir. 2015) ........................................................................................... 12

*O'Shea v. Littleton*,
   414 U.S. 488 (1973) ........................................................................................................ 12

*Phiffer v. Proud Parrot Motor Hotel, Inc.*,
   648 F.2d 548 (9th Cir. 1980) ........................................................................................... 13

*Rendell-Baker v. Kohn*,
   457 U.S. 830 (1982) ........................................................................................................ 19

*Skilstaf, Inc. v. CVS Caremark Corp.*,
   669 F.3d 1005 (9th Cir. 2012) ......................................................................................... 11

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ........................................................................................................ 11

*Whitmore v. Arkansas*,
   495 U.S. 149 (1990) ........................................................................................................ 12

## **Rules**

Fed. R. Civ. Proc. 12(b) ......................................................................................... 1, 10, 11

## **Other Authorities**

Confronting Health Misinformation: The U.S. Surgeon General's Advisory on Building
a Healthy Information Environment CRS Report, *Social Media: Misinformation and
Content Moderation Issues for Congress* (July 15, 2021),
   https://www.hhs.gov/sites/default/files/surgeon-general-misinformation-advisory.pdf ......... 7, 8

CRS Report, *Social Media: Misinformation and Content Moderation Issues for Congress*
(Jan. 27, 2021),
   https://crsreports.congress.gov/product/pdf/R/R46662 ............................................................. 4

Hearing Before the United States House of Representatives, Committee on Energy and
Commerce, Subcommittees on Consumer Protection & Commerce and Communications
& Technology (Mar. 25, 2021) (Testimony of Jack Dorsey),
   https://docs.house.gov/meetings /IF/IF16/20210325/111407/HHRG-117-IF16-Wstate-
   DorseyJ-20210325.pdf......................................................................................................... 6

Defs' Motion to Dismiss; Memo.
No.  3:22-cv-00737-CRB

Hearing Before the United States House of Representatives, Committee on Energy and Commerce, Subcommittees on Consumer Protection & Commerce and Communications & Technology (Mar. 25, 2021) (Testimony of Mark Zuckerberg), https://docs.house.gov/meetings/IF/IF16/ 20210325/111407/HHRG-117-IF16-Wstate-ZuckerbergM-20210325-U1.pdf .................................................................................... 6

https://twitter.com/TwitterSafety/status/1186403736995807232 ................................................... 5

Press Briefing by Press Secretary Jen Psaki (July 16, 2021), https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/16/press-briefing-by-press-secretary-jen-psaki-july-16-2021 ......................................... 7, 9, 17, 21

Press Briefing by Press Secretary Jen Psaki and Surgeon General Dr. Vivek H. Murthy (July 15, 2021), https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/15/press-briefing-by-press-secretary-jen-psaki-and-surgeon-general-dr-vivek-h-murthy-july-15-2021.................................................................................................................. 7, 9

"Strategy for Stopping False News." Tessa Lyons, *Hard Questions: What's Facebook's Strategy for Stopping False News?* (May 23, 2018), https://about.fb.com/news/2018/05/hard-questions-false-news.................................................... 5

Vijaya Gadde & Matt Derella, *An update on our continuity strategy during COVID-19* (Mar. 16, 2020; updated Apr. 1, 2020), https://blog.twitter.com /en_us/topics/company/2020/An-update-on-our-continuity-strategy-during-COVID-19.................................................................................................. 5, 6

Defs' Motion to Dismiss; Memo.
No.  3:22-cv-00737-CRB

**NOTICE OF MOTION AND MOTION TO DISMISS**

PLEASE TAKE NOTICE that on Thursday, April 21, 2022, at 2:00 p.m., or as soon thereafter as counsel may be heard, before The Honorable Charles R. Breyer, in Courtroom 6, 17th Floor, of the United States Courthouse, 450 Golden Gate Avenue, San Francisco, California, the defendants will move, and hereby do move, to dismiss this action under Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. This motion is based on the following Memorandum of Points and Authorities and any other written or oral argument that may be presented at or before the time this motion is heard by the Court.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

Social media companies have been fighting misinformation for some time, since at least 2018, and turned those efforts toward COVID-19 early in the pandemic, as early as February 2020. Under their respective community standards and misinformation policies, Facebook and Twitter allegedly disciplined Plaintiff due, in part, to posts they determined to contain COVID-19 misinformation, beginning in September 2020. Plaintiff now brings a First Amendment claim against U.S. Surgeon General Vivek Murthy and President Joseph R. Biden (for purposes of this motion, the "Federal Defendants") based on general strategies for addressing COVID-related misinformation that Surgeon General Murthy recommended to the public in July 2021—more than a year *after* Facebook and Twitter began to address COVID-19 misinformation—and he argues that these private companies' independent decisions to discipline him amount to state action attributable to the federal government. Plaintiff's claim lacks merit and should be dismissed.

To start, Plaintiff lacks standing for three independent reasons. First, he seeks only prospective relief against the Federal Defendants, but alleges only past harm—not that he will certainly be subject to some imminent, future injury. While he alleges that Facebook and Twitter *previously* disciplined him, he fails to allege that he will soon be subject to similar remedial measures. He does not allege that he plans to soon post messages similar to those that previously resulted in discipline, or that he will necessarily be subject to remedial measures again if he does. Thus, Plaintiff fails to establish the certainly impending future injury necessary to obtain

Defs' Motion to Dismiss; Memo.
No. 3:22-cv-00737-CRB

1    prospective equitable relief.

2        Second, Plaintiff fails to establish a causal link between the Federal Defendants and any

3    remedial measures that were taken by (or may be taken by) Facebook and Twitter against him.

4    Multiple other factors may have led these companies to police misinformation on their platforms;

5    *e.g.*, they may have independently decided that misinformation is detrimental to public health and

6    safety, or they may have concluded that misinformation on their platforms may cause their users to

7    move to competing platforms. The Complaint contains no well-pled allegations justifying the

8    inference that Facebook and Twitter chose to target posts containing misinformation because of the

9    Federal Defendants, rather than one or more of the other possible causes. As noted, the companies

10   began policing misinformation, and disciplining Plaintiff, well before the Federal Defendants

11   recommended anti-misinformation strategies to the public—suggesting that the former could not

12   have caused the latter. Just recently, in *Association of American Physicians & Surgeons v. Schiff*,

13   another district court dismissed an analogous suit for lack of standing based on the same reasoning.

14   518 F. Supp. 3d 505 (D.D.C. 2021), *aff'd sub nom. Ass'n of Am. Physicians & Surgeons, Inc. v.*

15   *Schiff*, 23 F.4th 1028 (D.C. Cir. 2022).

16       Third, Plaintiff cannot establish that the relief he seeks against the Federal Defendants

17   would redress any alleged injury. Even if the Court enjoined the Federal Defendants from

18   recommending anti-misinformation strategies, Facebook and Twitter could still independently

19   decide to continue to take action against misinformation. There is no indication that they would

20   withdraw their misinformation policies and allow any of their users to post messages discouraging

21   COVID-19 safety precautions. Accordingly, Plaintiff cannot establish any standing requirement—

22   injury, causation, or redressability—and the Court may dismiss their First Amendment claim

23   against the Federal Defendants for that reason alone.

24       But even if Plaintiff could establish standing, his First Amendment claim would fail on the

25   merits, as he cannot meet his high burden to show that the independent actions of Facebook and

26   Twitter—two *private* companies—amount to state action. While a plaintiff may sometimes

27   establish a Constitutional claim against the federal government based on actions taken by a private

28

2

party, it is rare:  He must show that the federal government "coerc[ed]" or "provided such significant encouragement" for the private party to take the precise action at issue "that the choice must in law be deemed to be that of the" government. *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). Where the federal government simply recommends approaches under which a private party retains discretion in deciding whether to take the action at issue, then the action is not attributable to the federal government. For three reasons, Plaintiff cannot establish a First Amendment claim under this standard.

First, Plaintiff's allegations do not establish that the Federal Defendants either coerced Facebook or Twitter, or encouraged them to a degree effectively amounting to coercion, to take any particular action or adopt any particular policy. To the contrary, Plaintiff's allegations demonstrate only that certain government officials proposed general strategies for combatting misinformation—strategies that private companies, including Facebook and Twitter, were free to adopt or disregard as they saw fit.

Second, Plaintiff does not allege that Federal Defendants called on Facebook or Twitter to specifically target any of *Plaintiff's* posts. Although certain officials called on social medial platforms to address "misinformation," there is no well-pled allegation indicating that any Federal Defendant specifically proclaimed that any of Plaintiff's posts contain misinformation. Nor is there any allegation that Federal Defendants provided a definition of "misinformation" that would necessarily encompass any of Plaintiff's posts. To the contrary, Federal Defendants indicated that there is no concrete definition of "misinformation," leaving social media platforms with undisturbed discretion to decide whether any particular post contains misinformation. Facebook and Twitter therefore independently concluded that certain of Plaintiff's posts included misinformation, a decision that cannot be attributed to the federal government. Recently, in *Children's Health Defense v. Facebook Inc.*, Judge Illston dismissed a nearly identical suit for precisely this reason. No. 20-CV-05787-SI, 2021 WL 2662064, at *1 (N.D. Cal. June 29, 2021).

Third, even if Plaintiff had adequately alleged that some federal government official encouraged Facebook or Twitter to target Plaintiff's posts in particular, there is no well-pled

3

allegation indicating that Federal Defendants encouraged either platform to take any specific remedial action against him, much less to temporarily disable his account. The materials the Complaint relies upon suggest only that Federal Defendants simply proposed several potential actions that social media companies could take against those spreading misinformation, leaving it to the companies to decide what actions, if any, they found proper. Once more, Facebook and Twitter thus independently decided to discipline Plaintiff, and that action therefore cannot be attributed to the federal government. Plaintiff's First Amendment claim thus fails on the merits.

The Court should dismiss the First Amendment claim against the Federal Defendants.

**BACKGROUND**

**I.      Misinformation on Social Media.**

Misinformation is a challenge that social media companies have been dealing with for some time. Several features unique to social media "contribute to the amplification and spread of potential misinformation," including "(1) the use of data mining and algorithms to sort, prioritize, recommend, and disseminate information," and "(2) the maximization of user engagement"—and often "online advertising revenue"—"as the foundation of social media companies' business models." CRS Report, *Social Media: Misinformation and Content Moderation Issues for Congress* (Jan. 27, 2021), at 2, https://crsreports.congress.gov/product/pdf/R/R46662.

To address this problem, social media platforms have developed "a range of content moderation practices," which they have "altered . . . over time." *Id*. at 2, 7. For example, in 2018, Facebook stated that "[f]alse news has long been a tool for economic or political gains"—used, for instance, "by adversaries in recent elections and amid ethnic conflicts around the world"—and detailed its "Strategy for Stopping False News." Tessa Lyons, *Hard Questions: What's Facebook's Strategy for Stopping False News?* (May 23, 2018), https://about.fb.com/news/2018/05/hard-questions-false-news. Facebook explained that it would: (i) "Remove accounts and content that violate our Community Standards" and "polices in other categories, such as spam, hate speech or fake accounts"; (ii) "partner[] with third-party fact-checkers to review and rate the accuracy of articles and posts on Facebook," and "[w]hen these organizations rate something as false, . . . rank

4

Defs' Motion to Dismiss; Memo.
No.  3:22-cv-00737-CRB

those stories significantly lower" in users' news feeds; and (iii) "Inform people by giving them more context on the posts they see," such as by directing users to other reporting on the subject. *Id*. Similarly, in 2019, Twitter announced that it was "working on a new policy to address synthetic and manipulated media." @TwitterSafety, Twitter, (Oct 21, 2019, 6:07 pm), https://twitter.com/TwitterSafety/status/1186403736995807232.

## II.    Social Media Companies' Efforts to Stem COVID-19 Misinformation.

Social media platforms turned their efforts to combat misinformation toward COVID-19 early in the pandemic. For example, Plaintiff himself alleges that "in February 2020, Facebook announced it would remove posts that suggested the virus was man-made" because it then believed "the theory had been debunked" based on the findings of "public health officials." Compl. (Facts) ¶ 40. Likewise, Twitter "introduc[ed] . . . policies on March 18," 2020, to "address content that goes directly against guidance from authoritative sources of global and local public health information." Vijaya Gadde & Matt Derella, *An update on our continuity strategy during COVID-19* (Mar. 16, 2020; updated Apr. 1, 2020), https://blog.twitter.com /en_us/topics/company/2020 /An-update-on-our-continuity-strategy-during-COVID-19. Twitter explained that it would "require people to remove tweets that include," for example, the "[d]enial of global or local health authority recommendations to decrease someone's likelihood of exposure to COVID-19 with the intent to influence people into acting against recommended guidance, such as: 'social distancing is not effective.'" *Id*. The company reported that, within two weeks, it had "removed more than 1,100 tweets containing misleading and potentially harmful content" and "challenged more than 1.5 million accounts which were targeting discussions around COVID-19 with spammy or manipulative behaviors." *Id*.

Additionally, on March 25, 2021, the CEOs of both Facebook and Twitter testified before Congress about the initiatives their respective platforms had independently developed to combat COVID-related misinformation. Mark Zuckerberg—Chief Executive Officer ("CEO") of Facebook's parent company, Meta Platforms—testified that Facebook has "made fighting misinformation and providing people with authoritative information a priority, and has developed

Defs' Motion to Dismiss; Memo.
No. 3:22-cv-00737-CRB

an "industry-leading fact-checking program" that involves "80 independent third-party fact-checkers." Testimony of Mark Zuckerberg, Hearing Before the United States House of Representatives, Committee on Energy and Commerce, Subcommittees on Consumer Protection & Commerce and Communications & Technology, https://docs.house.gov/meetings/IF/IF16/20210325/111407/HHRG-117-IF16-Wstate-ZuckerbergM-20210325-U1.pdf, at 2 (Mar. 25, 2021).[1] Mr. Zuckerberg testified that these initiatives have specifically targeted COVID-related misinformation. *See id.* at 3 (Facebook works to "keep harmful misinformation about Covid-19 from spreading on" its platform). Mr. Zuckerberg also stated that when "content" on Facebook "is rated false, [Facebook] significantly reduce[s] its distribution." *Id.* at 2. Thus, he testified that as of March 2021, Facebook had "remov[ed] over 12 million pieces of false content" involving "Covid-19 misinformation." *Id.* at 3. Facebook also "enhanced [its] recidivism policies" to target repeat offenders, and also "use[s] information from fact-checkers to improve [its] technology so [it] can identify misinformation faster in the future." *Id.* at 2; *see also id.* at 3 (Facebook "barr[ed] entities that have repeatedly shared false information" concerning COVID-19). Twitter CEO Jack Dorsey similarly discussed Twitter's "COVID-19 and vaccine misinformation policies," noting that it "use[s] a combination of machine learning and human review to assess potential violations of the Twitter Rules," and that "[i]f an account owner breaks our Rules," its "Tweet" may be "delete[d]." Testimony of Jack Dorsey, Hearing Before the United States House of Representatives, Committee on Energy and Commerce, https://docs.house.gov/meetings /IF/IF16/20210325/111407/HHRG-117-IF16-Wstate-DorseyJ-20210325.pdf, at 1-2 (Mar. 25, 2021). Thus, from the start of 2020, both Facebook and Twitter had independently begun developing policies and initiatives to identify, and take action against, misinformation on their platforms.

### III.   The Surgeon General's Advisory on Building a Healthy Information Environment.

In July 2021, long after Facebook and Twitter began targeting COVID-19 misinformation, the recently confirmed U.S. Surgeon General issued an "Advisory" discussing the role of misinformation in the pandemic and offering "recommendations" to address it. Confronting Health

---

[1] "[A] court may take judicial notice of matters of public record." *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001).

6

Misinformation: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment, https://www.hhs.gov/sites/default/files/surgeon-general-misinformation-advisory.pdf, at 3 (July 15, 2021) (hereinafter, "Advisory").[2] As the Advisory explains, health "[m]isinformation has caused confusion and led people to decline COVID-19 vaccines, reject public health measures as masking and physical distancing, and use unproven treatments." *Id*. at 4. And as the Surgeon General noted at a press briefing announcing the Advisory's release, "polls" showed "that [at one point,] two thirds of people who [were] not vaccinated either believe[d] in common myths about the COVID-19 vaccine or [thought] some of those myths might be true." Press Briefing by Press Secretary Jen Psaki and Surgeon General Dr. Vivek H. Murthy, https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/15/press-briefing-by-press-secretary-jen-psaki-and-surgeon-general-dr-vivek-h-murthy-july-15-2021, at 5 (July 15, 2021) (hereinafter, "7-15 Press Briefing"). Health misinformation "has [thus] led to avoidable illness and death." *Id.* at 2. Indeed, "99.5 percent of people who are in hospitals because of COVID are unvaccinated." Press Briefing by Press Secretary Jen Psaki, https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/16/press-briefing-by-press-secretary-jen-psaki-july-16-2021,     22 (July 16, 2021) (hereinafter, "7-16 Press Briefing"). Further, "[m]isinformation has also led to harassment of and violence against public health workers, health professionals, airline staff, and other frontline workers tasked with communicating evolving public health measures." Advisory, at 4. "[D]octors and nurses across our country," consequently, "are burning out." 7-15 Press Briefing, at 4.

The 22-page Advisory offers a variety of "recommendations" about what various segments of society "can do" to slow the spread of health misinformation—including "individuals, families, and communities," "educators and educational institutions," "health professionals and health organizations," "journalists and media organizations," "researchers and research institutions," and "governments." Advisory, at 3. On the single page addressing "technology platforms," the Advisory proposes a number of general strategies. For example, the Advisory notes that technology

---

[2] Internal citations and quotation marks are omitted throughout this brief, unless otherwise stated.

platforms may (i) help researchers "properly analyze the spread and impact of misinformation" by "[g]iv[ing] researchers access to useful data," (ii) counter misinformation by "[d]irect[ing] users to a broader range of credible sources," and (iii) "build 'frictions' . . . to reduce the sharing of misinformation," which may include "suggestions and warnings" on certain posts. *Id*. at 12.

As the Advisory notes, it serves as "a public statement that calls the American people's attention to a public health issue and provides recommendations for how that issue should be addressed." *Id*. at 3. While it proposes various strategies for containing misinformation, it does not purport to impose any obligations on social media companies, nor to displace their discretion to decide whether any particular post contains misinformation, and if so, what remedial action may be proper. The Advisory explicitly notes that "[d]efining 'misinformation' is a challenging task," and that there is no "consensus definition of misinformation." *Id*. at 17; *see also id.* at 4 ("any definition" of "misinformation will have "limitations"). It also cautions against the use of an overly stringent definition of "misinformation," noting that "it is important to be careful and avoid conflating controversial or unorthodox claims with misinformation" since "[t]ransparency, humility, and a commitment to open scientific inquiry are critical." *Id*. at 17. The Advisory likewise encourages social media companies to consider "potential unintended consequences of content moderation, such as migration of users to less-moderated platforms." Advisory, at 12. It stresses that, in considering "[w]hat kinds of measures" they may "adopt to address misinformation," social media companies should consider the importance of "safeguarding . . . free expression." *Id*. at 7.

In press briefings surrounding the Advisory's release, the White House Press Secretary stated that certain government officials are "in regular touch with social media platforms . . . about areas where [the Administration has] concern" and that the discussions are aimed at "better understand[ing] the enforcement of social media platform policies." 7-16 Press Briefing, at 6; *see also* 7-15 Press Briefing, at 9. She did not, however, suggest that these officials promoted any particular definition of "misinformation," or that they pressured social media platforms to take any particular action with respect to posts containing misinformation. To the contrary, the Press Secretary stated that "Facebook and any private-sector company" ultimately "makes decisions

Defs' Motion to Dismiss; Memo.
No. 3:22-cv-00737-CRB

about what information should be on their platform." 7-16 Press Briefing, at 12; *see also id.* at 7 ("They're . . . private-sector compan[ies]. They're going to make decisions about additional steps they can take.").

**IV.    Facebook's and Twitter's Alleged Responses to Plaintiff's Social Media Posts.**

Plaintiff alleges that Facebook has been taking action against his posts since at least September 2020, whether for violating its Community Standards or its COVID-related misinformation policies. In mid-September 2020, Facebook issued a "warning" against a July 2020 post for containing "[f]alse information about COVID-19." Compl. (Facts) ¶ 35. Later that month, it banned him from advertising and "going live" for 30 days for a post referencing Joseph Goebbels that violated its Community Standards. *Id.* ¶ 36. In April 2021, Facebook "restricted [Plaintiff's] ability . . . to post or comment for 24 hours" because three posts "violated its Community Standards"—one suggesting that a "co-founder" of the Black Lives Matter movement was a "trained Marxist" siphoning donations; another post not described in the Complaint; and a third stating: "This is the truth: Covid is almost gone in America" and "[h]ospitals are literally empty." *Id.* ¶ 37. And on July 13, 2021, Facebook "flagged" Plaintiff's post containing a chart titled "Masking Children is Impractical and Not Backed by Research or Real World Data," *id.* ¶¶ 1-2, noting that it "goes against [Facebook's] standards on misinformation," and prohibited Plaintiff from "post[ing] or comment[ing] for 3 days" in view of his "previous post[s] that didn't follow [its] Community Standards." *Id.* ¶ 4.

Plaintiff alleges that Twitter similarly took action against one of his posts. On July 18, 2021, Plaintiff posted on Twitter that "the CDC just reported that 70% of those who came down with #COvId19 [sic] symptoms had been wearing a mask," "masks don't protect you," and "you have to wonder if [masks] are part of the problem." Compl. (Facts) ¶ 5. Twitter, in response, "locked [Plaintiff's] account" because his post "[v]iolat[ed] [Twitter's] policy on spreading misleading and potentially harmful information related to COVID-19." *Id.* ¶ 6. (For simplicity, the aforementioned enforcement actions taken by Facebook and Twitter against Plaintiff are referred to as the "Remedial Measures.").

Defs' Motion to Dismiss; Memo.
No.  3:22-cv-00737-CRB

1    Plaintiff does not allege that he made any other, similar COVID-related posts on Facebook

2    or Twitter, and if so, whether the companies took any action in response. Plaintiff also does not

3    allege that he plans to make similar posts in the future on either Facebook or Twitter.

4    **V.    This Action.**

5    Plaintiff brings six claims, only two of which concern the federal government defendants.

6    In Count II, Plaintiff asserts a Freedom of Information Act ("FOIA") claim against the Department

7    of Health and Human Services and the Office of Management and Budget. That claim is not further

8    addressed here. In Count I—the subject of this motion—Plaintiff asserts a First Amendment claim

9    against Surgeon General Murthy and President Biden (for purposes of this motion, the "Federal

10   Defendants"), arguing that because the Surgeon General and certain unnamed White House staff

11   recommended general strategies to stem misinformation, they are responsible for the independent

12   decisions by Twitter and Facebook to take the Remedial Measures. Plaintiff seeks only prospective,

13   equitable relief against the Federal Defendants based on this claim. *See* Compl., at 21-22 (seeking

14   a declaratory judgment and injunction against the Surgeon General and President). The Federal

15   Defendants now move to dismiss the First Amendment claim.

16                               S̲T̲A̲N̲D̲A̲R̲D̲ ̲O̲F̲ ̲R̲E̲V̲I̲E̲W̲

17   A motion to dismiss under Rule 12(b)(1) challenges the Court's subject matter jurisdiction.

18   In reviewing a facial challenge to subject matter jurisdiction, the Court accepts the well-pled

19   allegations of the complaint as true, and determines whether those allegations are sufficient to

20   establish jurisdiction. *Leite v. Crane Co.*, 749 F.3d 1117, 1121-22 (9th Cir. 2014). However, in

21   assessing its jurisdiction, the Court may consider extra-pleading facts, such as those set forth in

22   declarations, and if necessary may resolve disputed jurisdictional facts, without converting the

23   motion to one for summary judgment. *See id.*

24   To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient

25   factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v.*

26   *Iqbal*, 556 U.S. 662, 678 (2009). The necessary facts "must affirmatively appear in the record" and

27   "cannot be inferred argumentatively from averments in the pleadings." *FW/PBS Inc. v. Dallas*, 493

28

                                        10

U.S. 215, 231 (1990). Bare "conclusions" are "not entitled to the assumption of truth," and so a complaint does not "suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678-69. "While the pleading standard for Rule 8(a) is liberal, the [f]actual allegations must be enough to raise a right to relief above the speculative level." *Cook v. Brewer*, 637 F.3d 1002, 1006 (9th Cir. 2011). Under Rule 12(b)(6), the Court may consider materials incorporated into the complaint by reference, as well as judicially noticeable materials, without converting the motion into one for summary judgment. *See Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1016 n.9 (9th Cir. 2012).

### ARGUMENT

### I.    Plaintiff lacks standing to assert its First Amendment claim against the Federal Defendants.

Plaintiff lack standing to seek relief against the Federal Defendants on his First Amendment claim. To establish standing, a plaintiff must show that [he] is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action . . . ; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).

Moreover, to obtain prospective equitable relief—the only type of relief that Plaintiff seeks—it is not enough to allege a *past* injury. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983); *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1973) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."). Rather, Plaintiff must demonstrate that he faces a "real and immediate threat" of *future* harm. *Lyons*, 461 U.S. at 102. The "threatened injury must be *certainly impending*" to suffice; allegations of "*possible* future injury do not satisfy . . . Art. III." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (emphasis added).

In addition, where, as here, "the plaintiff is not [himself] the object of [a] government action," standing "is ordinarily 'substantially more difficult' to establish." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992). Here, Plaintiff cannot satisfy any of these standing requirements.

11

Prospective Injury. Plaintiff fails to show that he will be subject to a "certainly impending" future injury. Although he claims that *prior* posts he made on Facebook and Twitter resulted in remedial action, he alleges no facts establishing that he will *again* post such messages on Facebook or Twitter. Additionally, Plaintiff provides no details concerning any hypothetical, future posts that would allow the Court to infer that those would be the types of posts against which Facebook and Twitter would inevitably take action. Thus, Plaintiff has failed to establish the "certainly impending" injury necessary for prospective relief. *Cf. Lyons*, 461 U.S. at 105-06 (although the plaintiff "may have been" subject to unlawful conduct, that "does nothing to establish a real and immediate threat that he would again be" subject to the same conduct in the future).

Causation. Plaintiff also fails to establish that any hypothetical future injury—or, for that matter, any of his alleged past injuries—will be (or were) caused by the Federal Defendants, rather than the independent decisions of Facebook and Twitter. To satisfy the causation requirement, a plaintiff "must show that the injury is causally linked or fairly traceable to the [defendants], and not the result of independent choices by" other parties. *Nw. Requirements Utilities v. F.E.R.C.*, 798 F.3d 796, 806 (9th Cir. 2015); *see also Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1517–18 (9th Cir. 1992) ("[T]he causation question . . . concern[s] only whether the Plaintiff's injury . . . is dependent upon [the defendant's] policy, or is instead the result of independent incentives governing [other parties'] decisionmaking process[es]."). The Ninth Circuit has described the Article III causation requirement as a "'*but for*' causation" requirement. *Phiffer v. Proud Parrot Motor Hotel, Inc.*, 648 F.2d 548, 552 (9th Cir. 1980) (emphasis added).

Here, the Complaint is bereft of factual support for the conclusory allegation that any remedial actions that Facebook and Twitter have taken (or may again take) against Plaintiff were (or will) be attributable to the Federal Defendants rather than the companies' independent judgment. Many other factors may have led Facebook and Twitter to decide to combat misinformation, irrespective of the Surgeon General's recommendations. For example, Facebook and Twitter may have independently concluded that misinformation in general—and misinformation concerning COVID-19 in particular—is harmful to the public, and that their

12

1   platforms should adopt measures to address misinformation. Likewise, they may have concluded

2   that the rampant spread of misinformation on their platforms would drive their users towards other

3   platforms that employ superior quality-control measures. The Complaint does nothing to suggest

4   that the disciplinary actions Facebook and Twitter took against Plaintiff were driven, not by these

5   independent considerations, but rather by the Federal Defendants' mere suggestions. For example,

6   Plaintiff does not allege that either Facebook or Twitter stated that, but for the Surgeon General's

7   Advisory, they would not attempt to counter COVID-related misinformation on their platforms.

8          To the contrary, the chronology of events, as reflected in Plaintiff's own allegations, firmly

9   *undermines* any inference of a causal link. Plaintiff alleges that the Federal Defendants

10  recommended anti-misinformation strategies beginning in or around mid-July 2021. *See supra* at

11  7-8. Yet public statements from Facebook and Twitter show that they have been addressing

12  misinformation in general since at least 2018, and began targeting COVID-related misinformation

13  as early as February 2020—long before Plaintiff alleges that Federal Defendants called attention to

14  the problem. *See supra* at 5-7. Those statements are consistent with Plaintiff's own allegations,

15  which indicate that Facebook started taking action against his posts, whether for violating its

16  Community Standards or COVID-related misinformation policies, in September 2020—again, well

17  before the Federal Defendants' alleged involvement. Specifically, Plaintiff alleges that "[o]n or

18  around September 15, 2020, Facebook issued [him] a warning regarding a post he had made in July

19  2020," and that "the warning claimed, 'False information about COVID-19 found in your post.'"

20  Compl. (Facts) ¶ 35. Plaintiff also alleges that, "[o]n April 23, 2021, Facebook restricted the ability

21  of [Plaintiff] to post or comment for 24 hours" in part because of a post he made stating that "Covid

22  is almost gone in America." Compl. (Facts) ¶ 37. Thus, the chronology shows that Facebook and

23  Twitter began taking action against misinformation long before the Federal Defendants allegedly

24  started recommending anti-misinformation strategies, refuting any suggestion that the latter caused

25  the former.

26         This case thus closely resembles *Association of American Physicians ("AAPS") &*

27  *Surgeons v. Schiff*, where the U.S. District Court for the District of Columbia dismissed an

28

13

analogous lawsuit because the plaintiff lacked standing. 518 F. Supp. 3d 505 (D.D.C. 2021), *aff'd sub nom. Ass'n of Am. Physicians & Surgeons, Inc. v. Schiff*, 23 F.4th 1028 (D.C. Cir. 2022). There, the plaintiff alleged that Congressman Adam Schiff sent letters and made public statements "encourag[ing]" certain technology companies—including Facebook and Twitter—to "prevent . . . inaccurate information on vaccines," and that these companies "took several adverse actions against [the plaintiff] because of Congressman Schiff's statements." *Id.* at 510. The court ultimately found that the plaintiff failed to establish standing, in part because its allegations did not show that its "alleged harms stem[med] from . . . Congressman Schiff." *Id.* at 515. The court noted that the plaintiff "ignore[d] the innumerable other potential causes for the actions taken by the technology companies," and that the alleged "statements made by Congressman Schiff" did "not mention [the plaintiff]" and did "not advocate for any specific actions." *Id.* at 515-16. The court further noted that the relevant statements by "Congressman Schiff" occurred "after the technology companies took many of the actions" at issue, and thus the plaintiff "fail[ed] to establish a chronological chain of causation between" Congressman Schiff's statements and the "actions taken by the technology companies." *Id.* at 516 n.12. The D.C. Circuit affirmed the district court's reasoning, confirming that "[t]he timeline of events in the . . . complaint . . . undermine[d] any possibility that the companies acted at Representative Schiff's behest in particular" because "Facebook announced its new policy of prioritizing government-sponsored vaccine information in search results in March 2019 . . . and Twitter introduced its" similar policy "in May 2019." *Ass'n of Am. Physicians & Surgeons, Inc. v. Schiff*, 23 F.4th 1028, 1034 (D.C. Cir. 2022).

The *AAPS* court's reasoning applies equally here: (i) Plaintiff likewise ignores the "innumerable other potential causes for the actions taken by" Facebook and Twitter, (ii) there is no well-pled allegation that the Federal Defendants "mention[ed] [the Plaintiff]" or "advocate[d] for any specific actions" against Plaintiff, and (iii) the companies were already policing misinformation before the Federal Defendants allegedly started recommending the anti-misinformation strategies at issue. Accordingly, Plaintiff fails to establish a causal link between the Federal Defendants and any adverse actions that Facebook or Twitter have taken, or will take, against Plaintiff.

Redressability. Even if Plaintiff had shown that that he would again post information that violates the policies of Facebook and Twitter; that the companies would certainly take remedial action against him; and that they would do so because of the Federal Defendants, rather than as an exercise of their independent judgment, he would still lack standing, as he cannot show that equitable relief would redress those injuries. Were the Court to enter the equitable relief that Plaintiff requests—*e.g.*, to "[e]njoin Murthy and Biden from [allegedly] directing social media companies to censor information with which Murthy and Biden disagree," Compl. at 22 ¶ B, Facebook and Twitter could still *independently* conclude that it is in their interest to take those remedial steps—as the sequence of events indicates they have been doing all along. *See supra* at 5-8. Thus, Plaintiff cannot show that the equitable relief he seeks would redress his alleged injuries.

Again, *AAPS* is instructive. The court there found that the plaintiff lacked standing not only because it failed to establish causation, but also because "[i]t [was] pure speculation that any order directed at Congressman Schiff . . . would result in the [technology] companies changing their behavior" towards the plaintiff. *AAPS*, 518 F. Supp. 3d at 516. The court stressed that it was "not plausible" that Facebook or Twitter would suddenly "revise their policies on medical misinformation" as a result of an injunction restraining Congressman Schiff's activities. *Id.* So too here. Accordingly, Plaintiff fails to establish any of the requirements for standing to seek injunctive relief against the Federal Defendants, and Count I should be dismissed against them for lack of jurisdiction.

## II.     Plaintiff fails to state a First Amendment claim against the Federal Defendants.

Even if Plaintiff could establish standing, his First Amendment claim against the Federal Defendants would fail on the merits. Plaintiff claims injury based on remedial actions taken by Facebook and Twitter—both *private* companies. But the First Amendment "safeguard[s] the rights of free speech" by imposing "limitations on *state action*, not on action by" private parties. *Lloyd Corp., Ltd. v. Tanner*, 407 U.S. 551, 567 (1972) (emphasis added). While a plaintiff may sometimes establish a First Amendment claim based on private conduct if it "can fairly be seen as state action," *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982), those circumstances are extraordinarily narrow:

Defs' Motion to Dismiss; Memo.
No. 3:22-cv-00737-CRB

the government "can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the" government. *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). "Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the" government "responsible for those initiatives." *Id.*

In addition to establishing coercion or a degree of encouragement approaching it, a plaintiff must also show that the government called on the private party to take the *precise action* at issue— *i.e.*, by "dictat[ing] the decision" made "in [that] particular case," *id.* at 1010, or insisting that the private party follow a "standard that would have *required*" that action, *Mathis v. Pac. Gas & Elec. Co.*, 75 F.3d 498, 503 (9th Cir. 1996) (emphasis added). It is not enough to show that the government recommended a general policy under which the private party retained discretion over whether to take the particular action at issue.[3] *Mathis*, 75 F.3d at 502 ("It wasn't enough to show that [the private party]" was driven by "a generalized federal concern" or "standards [that] would have required" action "on some materially different set of facts."); *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 357 (1974) (the "exercise of choice allowed by" a government policy "where the initiative comes from [the private party] and not from the [government], does not make [the] action in doing so 'state action'" under the Constitution).

These standards present a formidable bar to a plaintiff attempting to show that private conduct should be considered state action for First Amendment purposes: "While [courts] sometimes treat acts of private parties as public, [they] do so sparingly." *Mathis*, 75 F.3d at 501; *see also Florer v. Congregation Pidyon Shevuyim, N.A.*, 639 F.3d 916, 922 (9th Cir. 2011) (courts

---

[3] This specificity requirement applies regardless of how Plaintiff tries to frame his claim. For example, Plaintiff asserts not only that the Federal Defendants "encouraged" Facebook and Twitter to address misinformation, but also that the Federal Defendants "conspired" with Facebook and Twitter. *See* Compl. (Facts) ¶ 59. But to attribute private conduct to the government based on an alleged conspiracy,  a plaintiff must still show that the government entered into "an agreement or a conspiracy to violate [*the plaintiff's*] *rights in particular*." *See Brunette v. Humane Soc'y of Ventura Cty.*, 294 F.3d 1205, 1212 (9th Cir. 2002) (emphasis added), *as amended on denial of reh'g and reh'g en banc* (Aug. 23, 2002).

16

must "start with the presumption that conduct by private actors is not state action"). Plaintiff falls well short of that bar here.

### A.    Plaintiff fails to show coercion or a similar degree of encouragement.

To start, Plaintiff contends that Facebook and Twitter were "subject to government compulsion," Compl. ¶ 61, but he alleges no well-pled factual material to substantiate that claim—and it is plainly incorrect. While he claims that the Surgeon General "created and published an entire 22-page Advisory with *instructions* on how social media companies should remove [certain] posts, *id*. ¶ 18 (emphasis added), in fact the Advisory consists merely of "recommendations," Advisory at 3, only a single page of which addresses "technology platforms," *id*. at 12. Those recommendations, of course, are not binding on anyone. And it is difficult to fathom how Facebook and Twitter, two of the most dominant social media companies on the planet, could have been "coerc[ed]" by these recommendations, *Blum*, 457 U.S. at 1004—a term that is commonly understood to mean compulsion by threat, which there is no allegation of here.

Nor does Plaintiff allege facts establishing that the Federal Defendants provided "such significant encouragement" that "the choice must in law be deemed to be that of the" government. *Blum*, 457 U.S. at 1004. To be sure, the Advisory sets out various recommendations that the Surgeon General hopes will be adopted. But there is nothing unusual about using the bully pulpit to press for change on important issues, and doing so hardly converts private choices into state action. Just like the educators, journalists, and health professionals who were also addressed in the Advisory, Facebook and Twitter were free to adopt or ignore the Surgeon General's recommendations, with no threat of punishment. After all, as the Press Secretary noted during the Advisory's rollout, it is "Facebook and any private-sector company" that ultimately "makes decisions about what information should be on their platform." 7-16 Press Briefing, at 12.

### B.    Plaintiff fails to show that the Federal Defendants dictated Facebook's or Twitter's actions.

Even if Plaintiff had shown coercion or the like, his First Amendment claim against the Federal Defendants would still fail because his allegations do not show that the Federal Defendants dictated the precise actions that Facebook and Twitter took here—*i.e.*, by specifically targeting any

17

of *Plaintiff's* posts on the grounds that they contain "misinformation," or by imposing a definition of "misinformation" that would *necessarily* encompass any of Plaintiff's posts. To the contrary, the Surgeon General acknowledged that there was no concrete definition of "misinformation," *see supra* at 8-9, and that when companies are deciding whether particular posts contain misinformation, they should "avoid conflating controversial or unorthodox claims with misinformation," Advisory, at 17. Likewise, the Press Secretary repeatedly clarified that social media companies must make the ultimate decision over how they will address misinformation.[4] *See supra* at 8-9.

Accordingly, the strategies recommended by the Federal Defendants did nothing to disturb Facebook's and Twitter's discretion to determine which posts contained "misinformation," and consequently which posts may warrant remedial action. Facebook and Twitter therefore necessarily exercised their independent judgment to conclude that certain of Plaintiff's social media posts contained misinformation, and that remedial measures were appropriate. Those actions are attributable to Facebook and Twitter, not the Federal Defendants.

*Blum* is instructive. In that case, the plaintiffs—Medicaid recipients in nursing homes—asserted constitutional claims against a state government based on the decisions of *private* physicians to transfer the plaintiffs to lower cost nursing homes. 457 U.S. at 991. The plaintiffs argued that they were transferred only because of government regulations requiring nursing homes to transfer patients to lower cost facilities when the higher cost facilities are not "medically necessary." *See id.* at 994, 1008. The plaintiffs thus argued that the government was ultimately responsible for the transfer decisions made by the plaintiffs' private physicians. But the Supreme Court rejected this argument, noting that although the government imposed a general "medical necessity" transfer requirement, the factual determination of "whether [a] patient's care is

---

[4] To be sure, the Complaint does include a conclusory allegation that "[o]n information and belief, Defendants Biden and Murthy directed . . . Facebook and Twitter to" take action against "[Plaintiff's] social media posts." Compl. (Facts) ¶ 20. The Complaint, however, lacks any "factual enhancement" for this allegation, and thus it is "not entitled to the assumption of truth." *Iqbal,* 556 U.S. at 679. Indeed, the Complaint provides no basis for inferring that any Federal Defendant was even aware of Plaintiff in particular, or the precise social media posts at issue in this litigation.

Defs' Motion to Dismiss; Memo.
No.  3:22-cv-00737-CRB

medically necessary"—and thus whether the patient will ultimately be transferred—is "made by [a] private part[y]" (the physician). *Id.* at 1006-08. Thus, the government "regulations themselves d[id] not dictate the decision to . . . transfer in a particular case." *Id.* at 1010. The Court further explained:

> [A]lthough . . . transfers are made possible and *encouraged* [by the government regulations] for efficiency reasons, they can occur only after the decision is made that the patient does not need the care he or she is currently receiving. The [government] is simply not responsible for *that* decision . . . [and] if a particular patient objects to his transfer to a different nursing facility, the 'fault' lies not with the [government] but ultimately with the judgment, made by concededly private parties, that he is receiving expensive care that he does not need.

*Id.* at 1008 n.19 (emphasis added); *see also Rendell-Baker v. Kohn*, 457 U.S. 830, 841 (1982) (noting that the Court found state action lacking in *Blum* even though "[b]oth state and federal regulations encouraged the nursing homes to transfer patients to less expensive facilities when appropriate").

The same reasoning applies even more forcefully here: unlike in *Blum*, where the decisions of private parties were governed by federal regulation, here the Federal Defendants' recommendations are entirely voluntary. But even putting that aside, much as in *Blum*, where private parties had to apply the regulatory "medical necessity" standard, here the Federal Defendants allegedly called on social media platforms to address "misinformation." However, the ultimate decision of whether a particular social media post contains "misinformation" (or sufficient "misinformation" to merit some enforcement action) is left to the social media companies. *See supra* at 8-9. The Federal Defendants thus did not "dictate the decision" over whether misinformation was present "in [Plaintiff's] particular" posts. *Blum*, 457 U.S. at 1010.

*Mathis* is similarly instructive. There, the plaintiff claimed that a government agency was responsible for the decision of a private company to terminate the plaintiff's employment. In particular, the plaintiff—an employee at a nuclear power plant—claimed that "in workplace conversations, [he] agreed to sell marijuana offsite," and was consequently fired because the Nuclear Regulatory Commission ("NRC") had informally pressed the employer to adopt a policy of "exclud[ing]" employees for "offsite drug involvement." *Id.* at 501-02. The Ninth Circuit

19

concluded, however, that the NRC was not responsible for the plaintiff's loss of employment. Even assuming the agency had generally promoted an anti-drug policy, it did not specifically call for the policy to apply to employees such as the plaintiff (who "was essentially a messenger"), nor did it specifically target "the type of conduct [the plaintiff] was suspected of." *Id.* at 502. Thus, there was "no indication that the NRC had proposed a standard that would have required [the employer] to exclude [the plaintiff]." *Id.* at 503. Here, similarly, the Federal Defendants' proposed "standard" (that social media platforms address "misinformation") did not necessarily "require[]" Facebook and Twitter to target or "exclude" any of Plaintiff's specific posts.

For similar reasons, Judge Illston recently dismissed a nearly identical suit. In *Children's Health Defense v. Facebook*, the plaintiff claimed that Facebook violated the First Amendment by "censor[ing] [the plaintiff's] vaccine safety speech" on the platform at the encouragement of Congressman Schiff and the Centers for Disease Control ("CDC"). No. 20-CV-05787-SI, 2021 WL 2662064, at *1 (N.D. Cal. June 29, 2021). In particular, the plaintiff alleged that Congressman Schiff "urge[d] that Facebook implement specific algorithms to identify, censor and remove all so-called 'vaccine misinformation,'" and that the CDC "works with 'social media partners,'" including Facebook, "in its 'Vaccine with Confidence' initiative." *Id.* at *2-4. The plaintiff alleged that, as a result of governmental pressure, Facebook took action against certain posts by the plaintiff identifying alleged "severe health dangers of certain vaccines and technologies." *Id.* at *4. The court, however, found that neither Congressman Schiff nor the CDC was responsible for the disciplinary actions Facebook took against the plaintiff. It explained: "the phrase 'vaccine misinformation' is a general one that could encompass many different types of speech and information about vaccines," and thus the "general statements" by Congressman Schiff and the CDC concerning "vaccine misinformation" did not "mandate[] the *particular actions* that Facebook took with regard to [the plaintiff's] Facebook page." *Id.* at *9, 12 (emphasis added). The court further noted that Facebook took those "particular actions" based on "its *own* algorithms and standards for detecting 'vaccine misinformation.'" *Id* at *12 (emphasis added). The same is true

Defs' Motion to Dismiss; Memo.
No. 3:22-cv-00737-CRB

1   here, as Plaintiff similarly fails to show that the Federal Defendants dictated a finding that any of

2   Plaintiff's specific posts constituted misinformation warranting any remedial action.

3        Moreover, even if Plaintiff had shown otherwise, his claim would still fail for a separate

4   reason: he does not adequately allege that the Federal Defendants encouraged Facebook or Twitter

5   to take any particular remedial action against Plaintiff, much less the precise Remedial Measures

6   at issue here (temporarily suspending Plaintiff from the platforms). As explained above, social

7   media companies had to exercise independent judgment in settling on any particular enforcement

8   action. The Advisory, for example, proposes a range of potential remedies—including just labeling

9   posts that contain misinformation—and cautions that companies should assess those remedies, both

10  to determine whether there may be "unintended consequences" and to ensure that the remedies

11  would not unjustifiably impede "free expression." *See supra* at 8; Advisory at 12 (noting that

12  offending content may be "labeled" or "downranked," and that social media companies may

13  address misinformation by "[p]rovid[ing] information from trusted and credible sources"). Further,

14  the Press Secretary also reiterated that although government officials endorsed several strategies

15  for containing misinformation, social media companies ultimately had to make the *independent*

16  decision of which strategies (if any) to adopt. *See supra* at 8-9. She further explained:

17        [T]o be crystal clear: Any decision about platform usage and who should be on the
          platform is orchestrated and determined by private-sector companies. Facebook is
18        one of them . . . [a]nd there are a range of media who are—also have their own
          criteria and rules in place, and they implement them. And that's their decision to
19        do. That is not the federal government doing that.

20  7-16 Press Briefing, at 30. Thus, Facebook and Twitter independently chose to adopt the Remedial

21  Measures, temporarily suspending Plaintiff's accounts due to his anti-mask posts—a decision that

22  was neither "coerc[ed]" nor taken only upon "such significant encouragement" that it "must in law

23  be deemed to be that of the" government. *Blum*, 457 U.S. at 1004.[5] Plaintiff therefore fails to state

24  a First Amendment claim against the Federal Defendants.

25  _____

26  [5] Plaintiff again alleges, in conclusory fashion, that "Biden and Murthy directed Defendants
    Facebook and Twitter to *remove* [Plaintiff's] social media posts." Compl. (Facts) ¶ 20 (emphasis
27  added). The Court, however, need not credit this allegation. First, there is no factual support for
    this allegation, and thus it is not and thus the Court need not "entitled to the assumption of truth."
28  *Iqbal*, 556 U.S. at 679. Second, as explained above, this allegation contradicts statements in the

21

1

**CONCLUSION**

2        The Court should grant the Federal Defendants' Motion to Dismiss Plaintiff's First

3   Amendment claim against them (Count I). At a minimum, the Court should dismiss the First

4   Amendment claim insofar as it applies to, and is used a justification for injunctive relief against,

5   the President. *See Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992) (a "grant of injunctive

6   relief against the President himself [would be] extraordinary," and "in general," courts have "no

7   jurisdiction of a bill to enjoin the President in the performance of his official duties").

8   Dated:  March 17, 2022

9

10                                              Respectfully submitted,

11                                              BRIAN NETTER
                                                Deputy Assistant Attorney General

12                                              STEPHANIE HINDS
13                                              United States Attorney

14                                              ERIC BECKENHAUER
                                                Assistant Director, Federal Programs Branch
15

16                                              */s/ Kuntal Cholera*
                                                KUNTAL CHOLERA DC Bar No. 1031523
17                                              United States Department of Justice
                                                Civil Division, Federal Programs Branch
18                                              1100 L Street, N.W.
                                                Washington, DC 20005
19                                              Tel: (202) 305-8645
                                                Fax: (202) 616-8470
20

21

22

23

24

25
        ─────────────────────
26   Advisory along with the Press Briefing referenced in the Complaint, *see supra* at 8-9, and the Court
     "need not accept as true allegations contradicting documents that are referenced in the complaint,"
27   *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

28
                                                22
     Defs' Motion to Dismiss; Memo.
     No.  3:22-cv-00737-CRB

Email: kuntal.cholera@usdoj.gov

*Counsel for Defendants*

1
2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

3
4

JUSTIN HART,

5

    Plaintiff,

6

   v.

No.  3:22-cv-00737-CRB

7

FACEBOOK, INC., *et al.*,

**[PROPOSED] ORDER ON**
**DEFENDANTS' MOTION TO DISMISS**

8
9

    Defendants.

10
11

**[PROPOSED] ORDER**

12

  For the reasons set forth in the Memorandum of Points and Authorities submitted by

13

Defendants Vivek Murthy in his official capacity as the United States Surgeon General and Joseph

14

R. Biden, Jr. in his official capacity as President of the United States, the Court GRANTS their

15

Motion to Dismiss Count 1 of Plaintiff's Complaint insofar as it applies to them.

16
17
18

It is **SO ORDERED** this ____day of _____, 2022.

19
20

_____
The Honorable Charles R. Breyer
United States District Judge

21
22
23
24
25
26
27
28