1

2

3

4

5

6

TYLER BURSCH, LLP
Robert Tyler (STATE BAR NO. 179572)
rtyler@tylerbursch.com
Nada Higuera (STATE BAR NO. 299819)
nhiguera@tylerbursch.com
25026 Las Brisas Rd.
Murrieta, California 92562
Telephone: 951-600-2733
Facsimile: 951-600-4996

LIBERTY JUSTICE CENTER
Daniel Suhr, *pro hac vice*
dsuhr@libertyjusticecenter.org
M.E. Buck Dougherty III, *pro hac vice forthcoming*
bdougherty@libertyjusticecenter.org
James McQuaid, *pro hac vice*
jmcquaid@libertyjusticecenter.org
440 N. Wells St., Ste. 200
Chicago, Illinois 60654
Telephone: 312-637-2280
Facsimile: 312-263-7702

Attorneys for Plaintiff, Justin Hart

7

8

9

10

11

12

13

14

15

16

UNITED STATES DISTRICT COURT

17

NORTHERN DISTRICT OF CALIFORNIA

18

SAN FRANCISCO DIVISION

19

20

21  JUSTIN HART,

22          Plaintiff,

23      v.

24  FACEBOOK, INC. et al.,

25          Defendants.

26

27

28

Case No. 3:22-cv-00737-CRB

**PLAINTIFF'S COMBINED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND TO DEFENDANT TWITTER'S MOTION TO STRIKE**

Judge:    Hon. Charles R. Breyer
Date:     May 12, 2022
Time:     10:00 AM

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................iv

INTRODUCTION....................................................................................................1

LEGAL STANDARD ..............................................................................................2

ARGUMENT ...........................................................................................................2

I.   The federal free speech claim (Count I) should stand. ...................................2

   A.  Twitter and Facebook are state actors when they act either as willing participants with the government or subject to government compulsion. ..............................................................................2

   B.  Hart properly pled that Facebook and Twitter targeted him specifically. ......................................................................................6

   C.  Hart properly pled that Defendants were regularly working jointly to censor speech and were doing so at the time of his free speech violation. ..........................................................................................8

   D.  Biden and Murthy's motion to dismiss fails because it asserts countless facts that this Court cannot consider at this stage. ...................9

   E.  The cases Defendants rely on do not stand for the propositions they assert. ........................................................................................11

   F.  This Court has jurisdiction to issue the relief requested for a First Amendment violation.........................................................................13

II.  Hart's California free speech count (Count III) should stand because the California Constitution is even more protective of free speech than the U.S. Constitution..................................................................................14

III. Hart has adequately pled the elements of a promissory estoppel claim (Count IV). ..................................................................................................16

IV.  Hart's claim of intentional interference with a contractual relationship (Count V) must stand because Facebook seeks to apply an evidentiary standard inappropriate for a motion to dismiss and because Facebook misstates the law. .............................................................................................19

V.   Hart's negligent interference claim (Count VI) should stand because he has alleged a prospective economic advantage. .........................................20

VI.  Defendants' catchall defenses fail.................................................................21

   A.  Section 230 is not a defense to Hart's claims.............................................21

PLAINTIFF'S COMBINED RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS AND TO
DEFENDANT TWITTER'S MOTION TO STRIKE
3:22-cv-00737-CRB

ii

B. Facebook and Twitter's defenses based on their terms of service require the introduction of factual evidence not allowed at this stage of the pleadings. ................................................................................. 26

C. California's anti-SLAPP statute is inapplicable in federal court and in this case ............................................................................................... 29

    1. The Second Circuit applied the *Shady Grove* test in *La Liberte v. Reid* and held that California's anti-SLAPP statute conflicts with Rule 12 and is inapplicable in federal court. ................. 30

    2. In the alternative, if this Court applies *Planned Parenthood Federation of America,* it should still deny the anti-SLAPP motions because Hart has pled plausible claims under Rule 12. ......... 32

    3. If this Court does reach the merits of the anti-SLAPP motions, it should still deny them because they attempt to turn the statute on its head. ................................................................................. 33

CONCLUSION ...................................................................................................... 38

PLAINTIFF'S COMBINED RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS AND TO DEFENDANT TWITTER'S MOTION TO STRIKE
3:22-cv-00737-CRB

iii

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Cases**

*Abbas v. Foreign Policy Grp., LLC,*
    783 F. 3d 1328 (D.C. Cir. 2015)................................................................30, 31

*Adickes v. S. H. Kress & Co.,*
    398 U.S. 144 (1970)............................................................................10

*Applebaum v. Lyft, Inc.,*
    263 F. Supp. 3d 454 (S.D.N.Y. 2017) ..........................................................27

*Aron v. U-Haul Co. of Cal.,*
    143 Cal. App. 4th 796 (2006) ...................................................................29

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)..........................................................................2, 19

*Association of American Physicians & Surgeons v. Schiff,*
    518 F. Supp. 3d 505 (D.D.C. 2021)..............................................................12

*Batzel v. Smith,*
    333 F.3d 1018 (9th Cir. 2003) .................................................................25

*Bechard v. Broidy,* No. B293997,
    2020 Cal. App. Unpub. LEXIS 3969 (Cal. Ct. App. June 24, 2020) .......................20

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)..........................................................................20, 31

*Bell v. Hood,*
    327 U.S. 678 (1946) ..........................................................................13

*Bonni v. St. Joseph Health Sys.,*
    11 Cal. 5th 995 (2021) .......................................................................36

*Bozzio v. EMI Grp. Ltd.,*
    811 F.3d 1144 (9th Cir. 2016) ................................................................26

*Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.,*
    622 F.3d 996 (9th Cir. 2010) .................................................................27

*Broam v. Bogan,*
    320 F.3d 1023 (9th Cir. 2003)..................................................................2

*Bush v. Lucas,*
    462 U.S. 367 (1983)...........................................................................13

*Bushell v. JPMorgan Chase Bank, N.A.,*
    163 Cal. Rptr. 3d 539 (Cal. Ct. App. 2013) ..................................................17

*Carafano v. Metrosplash.com, Inc.,*
    339 F.3d 1119 (9th Cir. 2003) ................................................................26

*Carbone v. Cable News Network, Inc.,*
    910 F. 3d 1345 (11th Cir. 2018) ..............................................................30

*Children's Health Defense v. Facebook, Inc.,*
    546 F. Supp. 3d 909 (N.D. Cal. 2021) .........................................................12

*Coffee v. Google, LLC,* No. 20-cv-03901-BLF,
    2021 U.S. Dist. LEXIS 26750 (N.D. Cal. Feb. 10, 2021) .................................28

PLAINTIFF'S COMBINED RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS AND TO
DEFENDANT TWITTER'S MOTION TO STRIKE
3:22-cv-00737-CRB

iv

*Dae v. Traver*,
  69 Cal. App. 5th 447 (2021) ............................................................. 33, 37

*Daniel v. Wayans*,
  8 Cal. App. 5th 367 (Ct. App. 2017) ........................................................ 15

*Davis v. Nadrich*,
  94 Cal. Rptr. 3d 414 (Cal. Ct. App. 2009) ........................................ 19, 20

*Fair Hous. Council v. Roommates.com, LLC*,
  521 F.3d 1157 (9th Cir. 2008) ................................................................. 22

*FDIC v. Meyer*,
  510 U.S. 471 (1994).................................................................................. 13

*Fed. Agency of News LLC v. Facebook, Inc.*,
  432 F. Supp. 3d 1107 (N.D. Cal. 2020) ............................................. 21, 22

*FilmOn.com Inc. v. DoubleVerify Inc.*,
  7 Cal. 5th 133 (2019) .......................................................................... 34, 36

*Franklin v. Fox*,
  312 F.3d 423 (9th Cir. 2002) ..................................................................... 4

*Free Enterprise Fund v. Public Co. Accounting Oversight Board*,
  561 U.S. 477 (2010)................................................................................. 13

*Gardner v. CafePress Inc.*, No. 3:14-cv-0792-GPC-JLB,
  2014 U.S. Dist. LEXIS 173726 (S.D. Cal. Dec. 16, 2014)...................... 27

*Godecke ex rel. United States v. Kinetic Concepts, Inc.*,
  937 F.3d 1201 (9th Cir. 2019) ................................................................... 1

*Hanna v. Plumer*,
  380 U.S. 460 (1965).................................................................................. 29

*In re Juul Labs, Inc.*, No. 20-cv-02345-WHO,
  2021 U.S. Dist. LEXIS 157126 (N.D. Cal. Aug. 19, 2021)................. 27, 28

*In re: Yahoo! Inc. Customer Data Sec. Breach Litig.*,
  313 F. Supp. 3d 1113 (N.D. Cal. 2018) .............................................. 28, 29

*Janus v. AFSCME, Council 31*,
  138 S. Ct. 2448 (2018) ............................................................................... 3

*Kifle v. YouTube LLC*, No. 21-cv-01752-CRB,
  2021 U.S. Dist. LEXIS 193604 (N.D. Cal. Oct. 5, 2021) ........................ 26

*Kinderstart.com LLC v. Google, Inc.*, No. 06-CV-2057,
  2006 U.S. Dist. LEXIS 82481 (N.D. Cal. Nov. 7, 2006)........................... 12

*Klocke v. Watson*,
  936 F. 3d 240 (5th Cir. 2019 .............................................................. 30, 31

*L.A. v. Lyons*,
  461 U.S. 95 (1983) ................................................................................... 14

*La Liberte v. Reid*,
  966 F. 3d 79 (2nd Cir. 2020) ............................................................... 30, 31

*Lopez v. Smith*,
  203 F.3d 1122 (9th Cir. 2000) ................................................................. 38

PLAINTIFF'S COMBINED RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS AND TO
DEFENDANT TWITTER'S MOTION TO STRIKE
3:22-cv-00737-CRB

*Lugar v. Edmonson Oil Co.,*
   457 U.S. 922 (1982)..................................................................................2

*Makaeff v. Trump Univ.*, LLC,
   715 F. 3d 254 (9th Cir. 2013) ................................................................31

*Makaeff v. Trump Univ., LLC,*
   736 F. 3d 1180 (9th Cir. 2013) ..............................................................31

*Mathis v. Pac. Gas & Elec. Co.,*
   75 F.3d 498 (9th Cir. 1996) ......................................................................6

*Morongo Band of Mission Indians v. Rose,*
   893 F.2d 1074 (9th Cir.1990) .................................................................38

*Nelson v. Tucker Ellis, LLP,*
   262 Cal. Rptr. 3d 250 (Cal. App. Ct. 2020) ..........................................21

*Newman v. Google LLC*, No. 20-CV-04011-LHK,
   2021 U.S. Dist. LEXIS 119101 (N.D. Cal. June 25, 2021) ....................26

*O'Handley v. Padilla*, No. 21-cv-07063-CRB,
   2022 U.S. Dist. LEXIS 4491 (N.D. Cal. Jan. 10, 2022) ...................5, 28

*Ohno v. Yasuma,*
   723 F.3d. 984 (9th Cir. 2013) ...............................................................3, 4

*Owens v. Kaiser Found. Health Plan, Inc.,*
   244 F.3d 708 (9th Cir. 2001) ..................................................................37

*Packingham v. North Carolina,*
   137 S. Ct. 1730 (2017) ............................................................................15

*Pasadena Republican Club v. W. Justice Ctr.,*
   985 F.3d 1161 (9th Cir. 2021) .............................................................3, 11

*Peterson v. City of Greenville,*
   373 U.S. 244 (1963)...............................................................................10

*Planned Parenthood Fed'n of Am. v. Ctr. for Med. Progress,*
   890 F. 3d 828 (9th Cir. 2018) .................................................................32

*Price v. City of N.Y.,*
   2018 U.S. Dist. LEXIS 105815 (S.D.N.Y. June 25, 2018) ....................35

*Quelimane Co. v. Stewart Title Guaranty Co.,*
   19 Cal. 4th 26 (1988) ..............................................................................20

*Rawson v. Recovery Innovations,*
   975 F.3d 742 (9th Cir. 2020) ............................................................11, 12

*Renewable Land, Ltd. Liab. Co. v. Rising Tree Wind Farm, Ltd. Liab. Co.,*
   No. CV 12-0809 RT, 2013 U.S. Dist. LEXIS 17500 (E.D. Cal. Feb. 7, 2013) ...........2

*Robins v. Pruneyard Shopping Center,*
   23 Cal. 3d 899 (1979)........................................................................14, 15

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.,*
   559 U.S. 393 (2010).................................................................................29

*Shroyer v. New Cingular Wireless Servs., Inc.,*
   498 F.3d 976 (9th Cir. 2007).................................................................28

PLAINTIFF'S COMBINED RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS AND TO
DEFENDANT TWITTER'S MOTION TO STRIKE
3:22-cv-00737-CRB

vi

*United National Maintenance, Inc. v. San Diego Convention Ctr., Inc.*
    766 F.3d 1002 (9th Cir. 2014) ................................................... 20

*United States ex rel. Lee v. Corinthian Colleges,*
    655 F.3d 984 (9th Cir. 2011) ....................................................... 2

*United States ex rel. Newsham v. Lockheed Missiles & Space Co.,*
    190 F. 3d 963 (9th Cir. 1999) .................................................... 30

*United States v. Rothman,*
    492 F.2d 1260 (9th Cir. 1973) ............................................. 22, 23

*Universal Commun. Sys. v. Lycos, Inc.,*
    478 F.3d 413 (1st Cir. 2007) ...................................................... 25

*Wilson v. Cable News Network, Inc.,*
    7 Cal. 5th 871 (2019) .......................................................... 34, 35

*Zeran v. Am. Online, Inc.,*
    129 F.3d 327 (4th Cir. 1997) ...................................................... 23

*Zimmerman v. Facebook, Inc.,* No. 19-CV-4591,
    2020 WL 5877863 (N.D. Cal. Oct. 2, 2020) ............................... 16

**Statutes**

47 U.S.C. § 230 ........................................................................ passim

Cal. Civ. Proc. Code § 425.16 ......................................... 33, 34, 36

**Rules**

Fed. R. Civ. P. 12 ................................................................ 29, 31

Fed. R. Civ. P. 15 ...................................................................... 37

**Other Authorities**

Donie O'Sullivan, "What you need to know about the board deciding Trump's fate on
    Facebook," CNN.com (May 4, 2021) ......................................... 24

*In re Brazilian Medical Council*, 2021-008-FB-FBR (Meta Oversight Bd. Aug. 19,
    2021) ............................................................................... 24, 25

*In re French user*, 2020-006-FB-FBR (Meta Oversight Bd. Jan. 28, 2021) ............... 24

Vivek H. Murthy, *Confronting Health Misinformation: The U.S. Surgeon General's
    Advisory on Building a Healthy Information Environment* (2021) .......................... 7

*Watch: Biden delivers remarks on his administration's coronavirus response,*
    YouTube (Jan. 13, 2022) ............................................................ 14

White House Press Briefing (July 15, 2021) ..................................... 6, 9, 10

PLAINTIFF'S COMBINED RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS AND TO
DEFENDANT TWITTER'S MOTION TO STRIKE
3:22-cv-00737-CRB

vii

1

**INTRODUCTION**

2      When evaluating a motion to dismiss, the Court must accept all factual

3 allegations pled in the complaint as true. *Godecke ex rel. United States v. Kinetic*

4 *Concepts, Inc.*, 937 F.3d 1201, 1210 (9th Cir. 2019). Plaintiff, Justin Hart, pled that

5 Defendants Facebook, Twitter, Biden, and Murthy (the "Defendants") acted jointly to

6 remove his social media posts because they disagreed with the viewpoint those posts

7 espoused. Defendants dispute this factual allegation, and their motions to dismiss

8 amount to an effort to wish away the facts that were properly pled. Because those

9 facts must be accepted as true, this strategy of denial cannot succeed on a motion to

10 dismiss.

11     Furthermore, Defendants the Department of Health and Human Services and

12 the Office of Management and Budget have actively thwarted Hart's efforts to

13 receive further factual evidence through his Freedom of Information Act ("FOIA")

14 claim, Count II, which they did not move to dismiss. The remaining Defendants have

15 not responded to Hart's September 30, 2021, Rule 26(d)(2) Document Requests,

16 which would further shed light on the nature of the legal violations he suffered. Yet

17 they ask this Court to dismiss all his claims at the motion-to-dismiss stage. This

18 they cannot do. At this stage, the Court must accept Hart's factual allegations as

19 true, and Hart has ably pled that Defendants acted jointly to deprive him of his right

20 to free speech under the U.S. and California constitutions.

21     Additionally, Hart has pled a viable promissory estoppel claim against Facebook

22 and Twitter and viable claims for intentional interference with a contract and

23 negligent interference with a prospective economic advantage against Facebook.

24     For these reasons, this Court should deny Defendants' motions to dismiss and

25 motion to strike.

26

27

28

1

**LEGAL STANDARD**

2   "When ruling on a 12(b)(6) motion, the complaint must be construed in the light

3   most favorable to the plaintiff. The court must accept as true all material allegations

4   in the complaint, as well as reasonable inferences to be drawn from them."

5   *Renewable Land, Ltd. Liab. Co. v. Rising Tree Wind Farm, Ltd. Liab. Co.*, No. CV

6   12-0809 RT, 2013 U.S. Dist. LEXIS 17500, at *3 (E.D. Cal. Feb. 7, 2013) (quoting

7   *Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003). The Court "must determine

8   whether the Complaint contains 'sufficient factual matter' that, taken as true, 'state

9   a claim for relief [that] is plausible on its face.'" *United States ex rel. Lee v.*

10   *Corinthian Colleges,* 655 F.3d 984, 991 (9th Cir. 2011) (quoting *Ashcroft v. Iqbal,* 556

11   U.S. 662, 678 (2009)). Where such supporting factual allegations exist, a court

12   "assume[s] their veracity and then determine[s] whether they plausibly give rise to

13   an entitlement to relief." *Id.* "A claim has facial plausibility when the plaintiff pleads

14   factual content that allows the court to draw the reasonable inference that the

15   defendant is liable for the misconduct alleged." *Ashcroft,* 556 U.S. at 678.

16

**ARGUMENT**

17   I.      **The federal free speech claim (Count I) should stand.**

18          A. **Twitter and Facebook are state actors when they act either as**
              **willing participants with the government or subject to**
19            **government compulsion.**

20   Twitter and Facebook (the "Social Media Defendants") argue that the First

21   Amendment applies only to government actors (Twitter Mot. to Dismiss 7; Facebook

22   Mot. to Dismiss 5, 7), but this is wrong as a matter of law. Private entities engage in

23   state action when they work with government officials to deprive individuals of their

24   constitutional rights. *Lugar v. Edmonson Oil Co.,* 457 U.S. 922, 942 (1982). The

25   extension of liability to private parties includes actions they take with the

26

27

28   PLAINTIFF'S COMBINED RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS AND TO
     DEFENDANT TWITTER'S MOTION TO STRIKE
     3:22-cv-00737-CRB

2

government to violate the First Amendment. *See, e.g., Janus v. AFSCME, Council 31*, 138 S. Ct. 2448 (2018).

Defendants Biden and Murthy (the "Federal Defendants") misstate Hart's position when they allege that "Plaintiff contends that Facebook and Twitter were 'subject to government compulsion.'" Federal Mot. to Dismiss 17 (quoting Compl. ¶ 61). The Complaint *actually* says that "Facebook and Twitter were *either* willful participants" in the censorship of Hart's speech "*or* they were subject to government compulsion." Compl. ¶ 61 (emphasis added). As Hart pled, (Compl. ¶ 55), the relevant Ninth Circuit test lists "governmental compulsion or coercion" and willing "joint action" as two of the four possible methods for proving state action. *Pasadena Republican Club v. W. Justice Ctr.*, 985 F.3d 1161, 1167 (9th Cir. 2021); *Ohno v. Yasuma*, 723 F.3d 984, 995 (9th Cir. 2013). Hart can succeed under either theory.

Defendants argue that Hart has not made a factual allegation demonstrating government coercion. Twitter Mot. to Dismiss 8-9; Facebook Mot. to Dismiss 5; Federal Mot. to Dismiss 17. That is untrue. Hart has alleged that senior White House officials regularly contact senior corporate executives to direct them to take down what they deem to be misinformation. Compl. ¶¶ 7-20 *bis*. Hart quoted White House Press Secretary Jen Psaki as saying, "We're flagging problematic posts for Facebook that spread disinformation." Compl. ¶ 10 *bis*. Psaki further revealed that the White House effort to suppress free speech reaches all the way to the level of senior staff: "[W]e are in regular touch with these social media platforms, and those engagements typically happen through members of our senior staff . . . ." Compl. ¶ 11 *bis*. She concluded with a clear directive from the president: "Facebook needs to move more quickly to remove harmful, violative posts[.]" Compl. ¶ 16 *bis*. Hart pled that this effort amounts to more than a simple request. Specifically supporting the government compulsion test, Hart alleged that "Biden . . . threatened social media

PLAINTIFF'S COMBINED RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS AND TO DEFENDANT TWITTER'S MOTION TO STRIKE
3:22-cv-00737-CRB

3

companies who do not comply with his directives by publicly shaming and humiliating them, stating, 'They're killing people.'" Compl. ¶ 19 *bis*. Social media is a highly regulated industry with public battles over the future of Section 230 legislation and ongoing antitrust investigations, including by executive branch agencies. When the president of the United States himself shames the Social Media Defendants in public for not complying with his directives, such a statement amounts to what Hart pled is a "threat[ ]," taking place both in public and in private. *Id*. Thus, Hart has properly pled government compulsion.

The second legal theory for Hart's success in pleading state action by the Social Media Defendants is much easier to meet: joint action. A private party's actions amount to state action if "state officials and private parties have acted in concert effecting a particular deprivation of constitutional rights." *Franklin v. Fox,* 312 F.3d 423, 445 (9th Cir. 2002). "'Joint action' exists where the government affirms, authorizes, encourages, *or* facilitates unconstitutional conduct through its involvement with a private party." *Ohno,* 723 F.3d at 996 (emphasis added).

In this case, Hart pled that the government has affirmed, authorized, encouraged, *and* facilitated the removal of social media posts by the Social Media Defendants. Despite Defendants' denials (Twitter Mot. to Dismiss 11, Federal Mot. to Dismiss 12), Hart pled that the Biden Administration participated in joint action by being "in regular touch with these social media platforms" (Compl. ¶ 12 *bis*.) and by "flagging problematic posts for Facebook that spread disinformation." Compl. ¶ 10 *bis*. Such action constitutes both encouraging and facilitating the stifling of free speech, which also was publicly affirmed and authorized in the "22-page Advisory with instructions on how social media companies should remove posts with which Murthy and Biden disagree." Compl. ¶ 18 *bis*. Thus, Hart has also pled that the Social Media Defendants participated in joint action with the government.

1    Hart has sufficiently alleged that the Social Media Defendants are "willing

2  participants" in the scheme. They have not refused the White House's phone calls, or

3  publicly insisted on an internet free from government interference. Instead, they

4  have established "dedicated reporting pathways" for government officials to identify

5  what needs to be taken down. *O'Handley v. Padilla*, No. 21-cv-07063-CRB, 2022 U.S.

6  Dist. LEXIS 4491, at *9 (N.D. Cal. Jan. 10, 2022). This is textbook willing

7  participation and substantial coordination.

8    Defendants' responses amount to what should have been pled as denials of the

9  factual allegations in an Answer. For example, Facebook claims, "Plaintiff must

10  point to a statement from the government 'direct[ing] Facebook to adopt [a] specific

11  standard to follow'." Facebook Mot. to Dismiss 5. Not only did Hart point to a

12  statement from the government, but he also pointed to an "entire 22-page Advisory

13  with instructions" on the specific standard for Facebook to follow. Compl. ¶ 18 *bis*.

14  Facebook can deny the truth of the factual allegation, but it cannot deny that the

15  allegation exists.

16    Similarly, Twitter claims Hart has "not alleged any direct communication

17  between the Federal Defendants and Twitter." Twitter Mot. to Dismiss 10. On the

18  contrary, Hart pled that "Murthy and Biden engaged in viewpoint discrimination

19  when they directed Facebook and Twitter to remove social media posts . . . ." Compl.

20  ¶ 53. Further, Twitter acknowledges that Hart pled that Biden and Murthy

21  "'directed Defendants Facebook and Twitter to remove Hart's social media posts,'"

22  (Twitter Mot. to Dismiss 9 (quoting Compl. ¶ 20 *bis*.)), but Twitter tries to

23  characterize this statement as "conclusory." Twitter Mot. to Dismiss 9. On the

24  contrary, the statement is supported by the numerous statements made by Jen

25  Psaki and President Biden above. Twitter continues that Hart "does not allege any

26  conspiratorial objective" for suppressing his free speech. On the contrary, Hart pled

27

28    PLAINTIFF'S COMBINED RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS AND TO
DEFENDANT TWITTER'S MOTION TO STRIKE
3:22-cv-00737-CRB

that Twitter and Facebook acted jointly with Biden and Murthy to further the conspiratorial objective to remove posts that "contained a viewpoint on COVID-19 that did not fit with their own political narrative." *Id*. As with Facebook, Twitter may deny the truth of the factual allegations in the Complaint, but it may not deny that they were made in the Complaint.

### B. Hart properly pled that Facebook and Twitter targeted him specifically.

Defendants argue that Hart must plead that Defendants Biden and Murthy called on the Social Media Defendants to take action against him *specifically*. Federal Mot. to Dismiss 16, 20-21; Facebook Mot. to Dismiss 5-6. Hart did: "On information and belief, Defendants Biden and Murthy directed Defendants Facebook and Twitter to remove Hart's social media posts because they disagreed with the viewpoints he espoused in them and conspired with Facebook and Twitter to do so." Compl. ¶ 20 *bis*.

Furthermore, the government's own citations undermine their argument. The Federal Defendants acknowledge that a plaintiff can meet his burden by showing that the government "insist[ed] that the private party follow a 'standard that would have required'" the action they took. Federal Mot. to Dismiss 16 (quoting *Mathis v. Pac. Gas & Elec. Co.,* 75 F.3d 498, 503 (9th Cir. 1996)). This the Complaint plainly alleges. Hart pled that Murthy asked social media companies to "consistently take action against misinformation super-spreaders on their platforms." Compl. ¶ 8 *bis* (quoting Defendant Murthy).[1] The Biden Administration "increased disinformation research and tracking" and was "flagging problematic posts for Facebook that spread

---

[1] All direct quotations of Defendant Murthy and Press Secretary Psaki in this paragraph are from the White House Press Briefing (July 15, 2021), transcript available at https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/15/press-briefing-by-press-secretary-jen-psaki-and-surgeon-general-dr-vivek-h-murthy-july-15-2021/ (last visited Apr. 17, 2022)

PLAINTIFF'S COMBINED RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS AND TO DEFENDANT TWITTER'S MOTION TO STRIKE
3:22-cv-00737-CRB

disinformation." Compl. ¶ 10 *bis* (quoting Press Secretary Psaki). "[M]embers of [the Administration's] senior staff" were "in regular touch with these social media platforms." Compl. ¶ 12 *bis* (quoting Press Secretary Psaki). The government directed social media companies to "create a robust enforcement strategy that bridges their properties and provides transparency about the rules." Compl. ¶ 15 *bis* (quoting Press Secretary Psaki). The government specifically exhorted Facebook to "move more quickly to remove harmful" posts. Compl. ¶ 16 *bis* (quoting Press Secretary Psaki). Biden publicly shamed and humiliated social media companies that did not comply with his censorship. Compl. ¶ 19 *bis*. And Defendant Murthy created and published a document instructing social media companies to remove posts with which Murthy and Biden disagree. Compl. ¶ 18 *bis*. This Advisory, referenced in the Complaint, proffers itself as "a public statement that calls the American people's attention to a public health issue and provides recommendations for how that issue should be addressed" and dictates that social media platforms "make meaningful long-term investments to address misinformation."[2] In other words, "the government called on the private party to take the *precise action* at issue"—the suppression of Hart's speech. Federal Mot. to Dismiss 16 (emphasis in original).

In the alternative, even if Hart were required to prove at this stage that the Federal Defendants conspired with the Social Media Defendants with respect to him specifically—and, again, he is not—his failure to do so is due to the actions of the Federal Defendants and Defendants HHS and OMB, and defendants may not reap a legal benefit from their own bad acts. Count II, which no party has moved to dismiss,

---

[2] Vivek H. Murthy, *Confronting Health Misinformation: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment* (2021) 3, 12, *available at* https://www.hhs.gov/sites/default/files/surgeon-general-misinformation-advisory.pdf (last visited Apr. 17, 2022)

PLAINTIFF'S COMBINED RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS AND TO DEFENDANT TWITTER'S MOTION TO STRIKE
3:22-cv-00737-CRB

7

asserts that Defendants HHS and OMB have failed to respond to Hart's FOIA request within the required 20 business days after they were submitted on July 22, 2021. Compl. ¶¶ 67-73. The request specifically sought "[a]ll records of communications . . . between the White House or HHS and any social media company related to Justin Hart or his social media posts." It is attached as Exhibit A to Exhibit 1 to this Response; the OMB denial of expedited processing is attached as Exhibit B to Exhibit 1; and Hart's appeal is attached as Exhibit 1. Hart asked for similar information from Defendants Facebook, Twitter, HHS, and Biden on September 30, 2021 in his Rule 26(d)(2) Document Requests, attached as Exhibits 2-5; thus far, Defendants have not responded. Without this information that Defendants are withholding, Hart is being stymied from proving his case thus far. But at this stage, he must only plead it, and he has with sufficiency.

### C. Hart properly pled that Defendants are regularly working jointly to censor speech and were doing so at the time of his free speech violation.

Defendants mistakenly make much of the timeline of events in the Complaint. They argue that the government statements Hart "relies on" were made after Facebook took down his posts or made efforts to curb COVID-19-related "misinformation." Facebook Mot. to Dismiss 4, 6; Federal Mot. to Dismiss 13. Even Twitter attempts to argue likewise (Twitter Mot. to Dismiss 9, 11), ignoring the fact that Twitter locked Hart's account three days *after* Defendant Murthy publicly announced that the government was asking social media companies to engage in censorship. Compl. ¶¶ 5, 6, 8 *bis*. Defendants ask this Court to read Defendant Murthy's statement as proof that a new policy of censorship was being inaugurated at the July 15, 2021, press conference and as proof that the Federal Defendants had not coerced or cooperated with the Social Media Defendants when Hart's Facebook account was locked on or around July 13, 2021. Not so. Press Secretary Jen Psaki

PLAINTIFF'S COMBINED RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS AND TO DEFENDANT TWITTER'S MOTION TO STRIKE
3:22-cv-00737-CRB

8

1    admitted at the same press conference that "we [the Biden Administration] *are* in

2    regular touch with these social media platforms." Compl. ¶ 12 *bis* (emphasis added).

3    This is not a prospective statement, as Defendants wish to portray it. If the Press

4    Secretary was announcing a new policy, she would have said "we *will be* in regular

5    touch." Instead, she described an already-existing, ongoing policy. As further proof

6    that it was not a prospective statement, the Court can take judicial notice that the

7    Press Secretary went further, listing a score of actions "that we *have* taken": "We've

8    increased disinformation research and tracking. . . . We're flagging problematic

9    posts. . . . We also created . . . the COVID Community Corps. . . . You saw an

10    example of that yesterday."[3] Psaki continued, "There are also proposed changes that

11    *we have made* to social media platforms . . . we *have* recommended – proposed that

12    they create a robust enforcement strategy."[4] None of these statements support the

13    Defendants' thesis that the timing of the press briefing is detrimental to Hart's

14    claims.

15

16    **D. Biden and Murthy's motion to dismiss fails because it asserts**
      **countless facts that this Court cannot consider at this stage.**

17    The best evidence that the motions to dismiss should fail at this stage is the

18    sheer number of facts asserted by Biden and Murthy to try to bolster their motion to

19    dismiss. Instead of accepting Hart's factual allegations as true, the Federal

20    Defendants offered their own set of countervailing facts in an effort to disprove

21    Hart's facts. The Court cannot consider these disputed, material facts at this stage of

22    the pleadings.

23

24    [3] Jen Psaki, White House Press Briefing (July 15, 2021), transcript available at

25    https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/15/press-briefing-
by-press-secretary-jen-psaki-and-surgeon-general-dr-vivek-h-murthy-july-15-2021/

26    (last visited April 17, 2022) (emphasis added).

27    [4] *Id.* (emphasis added).

28    PLAINTIFF'S COMBINED RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS AND TO
DEFENDANT TWITTER'S MOTION TO STRIKE
3:22-cv-00737-CRB

9

First, Biden and Murthy offered two pages of facts regarding social media companies' efforts to stem COVID-19 misinformation. Federal Mot. to Dismiss 5-6. The Federal Defendants discuss at length prior efforts by the Social Media Defendants to curb COVID-19 misinformation to suggest that the Social Media Defendants were simply acting in accordance with preexisting policy. Federal Mot. to Dismiss 2, 5-6, 12-13, 18-19. But these allegations are belied by Defendant Murthy's own words at the Press Briefing referenced in Hart's Complaint: "we're saying *we expect more* from our technology companies."[5] Although the Social Media Defendants were already censoring alternative viewpoints, the Biden Administration felt that they were not going far enough. Furthermore, state action can exist "regardless of whether [the private person] was motivated by the command" of the government or would have done the same thing on his own volition. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 192 (1970) (Brennan, J., concurring) (describing the holding of *Peterson v. City of Greenville*, 373 U.S. 244 (1963)).[6]

Second, the Federal Defendants characterize the Surgeon General's Advisory as containing purely "recommendations" that do "not purport to impose any obligations on social media companies." Federal Mot. to Dismiss 8, 17. But this sleight of hand obscures the broader picture alleged by Hart: multiple statements by the White House Press Secretary as to the President's policy and admissions that senior White House officials regularly call senior corporate executives to hound them on posts.

Third, the Federal Defendants argue that the Social Media Defendants could have independently concluded it was in their best interest to censor Hart's speech.

---

[5] *Id.* (emphasis added).

[6] *Adickes* and *Peterson* both arose in the context of the Civil Rights Era, and their holding makes sense. Racial discrimination by private parties undertaken at the state's behest constitutes state action even if the private parties were themselves racists who would have been discriminatory in their attitudes and actions regardless of the state's direction.

PLAINTIFF'S COMBINED RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS AND TO
DEFENDANT TWITTER'S MOTION TO STRIKE
3:22-cv-00737-CRB

1    Federal Mot. to Dismiss 15, 19, 21. The Complaint belies this possibility, too, by

2    demonstrating a pattern of the Social Media Defendants following the Biden

3    Administration's lead on viewpoint suppression. The Complaint details how

4    Facebook originally censored the claim that COVID-19 was man-made but reversed

5    course after President Biden acknowledged the possibility of that theory.

6    Compl. ¶ 40. Facebook can attempt to prove otherwise after the discovery process,

7    but the facts that Hart has alleged suggest that Facebook is indeed following the

8    federal government's instructions on whom to censor. And again, the Federal

9    Defendants should not be allowed to argue that Hart has been unable, at this early

10   stage, to *prove* that the Social Media Defendants' actions were "driven . . . by the

11   Federal Defendants' mere suggestions" rather than by independent considerations

12   (Federal Mot. to Dismiss 13) when the Federal Defendants themselves and their

13   employees and departments have withheld from Hart information that would prove

14   precisely that. Compl. ¶¶ 67-73.

15

16       **E.  The cases Defendants rely on do not stand for the propositions
            they assert.**

17       Defendant Facebook argues that it cannot be a state actor absent a financial

18   benefit to the government. Facebook Mot. to Dismiss 7. But the primary case

19   Facebook relies on is inapposite. *Pasadena Republican Club v. Western Justice*

20   *Center,* 985 F.3d 1161 (9th Cir. 2021), used financial benefit as one of several factors

21   to determine a "significant degree of integration, dependency, and coordination" to

22   establish joint action. 985 F.3d at 1169. Indeed, the other factor *Pasadena* identified

23   as a "hallmark of a symbiotic relationship" between a public authority and a private

24   entity was "substantial coordination," *id*. at 1168, which Hart has certainly alleged

25   exists here. Moreover, *Pasadena* relies on the Ninth Circuit's decision in *Rawson v.*

26   *Recovery Innovations,* 975 F.3d 742 (9th Cir. 2020), which found state action even

27

28

though "the record . . . [did] not indicate whether [the state actor was] in any sense financially dependent upon the business of [the private actor]." 975 F.3d at 756 (emphasis added). Facebook's other case observed that a financial "relationship *may* be sufficient to establish state action." *Kinderstart.com LLC v. Google, Inc.,* No. 06-CV-2057, 2006 U.S. Dist. LEXIS 82481 at *15 (N.D. Cal. Nov. 7, 2006). In fact, *Kinderstart* treated "significant financial benefits" (*Id.;* Facebook Mot. to Dismiss 7) as an entirely separate way of determining state action than "joint action" (2006 U.S. Dist. LEXIS 82481 at *13-14).

The Federal Defendants also seek succor in *Association of American Physicians & Surgeons v. Schiff,* 518 F. Supp. 3d 505 (D.D.C. 2021) (Federal Mot. to Dismiss, Dkt. 69 at 14), and Defendant Facebook cites *Children's Health Defense v. Facebook, Inc.,* 546 F. Supp. 3d 909 (N.D. Cal. 2021) (Facebook Mot. to Dismiss 6). Both of those cases concerned calls for censorship from a single Congressman (the same Congressman, in fact)—1/435th of one-half of the legislative branch. The court in *Schiff* found that the Congressman did "not advocate for any specific actions," and made his statements "after the technology companies took many of the actions at issue." *Schiff,* 518. F. Supp. 3d at 515-16; Dkt. 69 at 14. Likewise, the court in *Children's Health Defense* found that the Congressman's statements did not "mandate[] the particular actions that Facebook took." 546 F. Supp. 3d at 930. Rep. Adam Schiff does not have the power to effect executive action like the President of the United States. The Congressman's conduct—"sen[ding] letters and ma[king] public statements" (Federal Mot. to Dismiss 14) is also not comparable to "being in regular touch with these social media platforms" via "engagements" with "members of [the Administration's] senior staff." Compl. ¶ 12 *bis* (quoting Press Secretary Psaki). Further unlike those cases, where the Congressman "did not advocate for any specific actions," Defendants Murthy and Biden did just that. Compl. ¶¶ 14-17.

PLAINTIFF'S COMBINED RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS AND TO DEFENDANT TWITTER'S MOTION TO STRIKE
3:22-cv-00737-CRB

12

1

### F. This Court has jurisdiction to issue the relief requested for a First Amendment violation.

2

3      The Social Media Defendants argue that Count I should be dismissed because it

4   alleges a direct violation of the First Amendment rather than a *Bivens* action, but

5   then they undermine that argument by asserting *Bivens* actions cannot be brought

6   against corporations. Twitter Mot. to Dismiss 6-7 and n.7, Facebook Mot. to Dismiss

7   7. As Defendants know, a *Bivens* action exists as a workaround to sovereign

8   immunity for the federal government, and it allows, instead, individual federal

9   officials to be held liable in their official capacity. See, e.g., *FDIC v. Meyer,* 510 U.S.

10  471, 485-86 (1994); *Bush v. Lucas,* 462 U.S. 367, 374-75 (1983). Therefore, it was not

11  designed to be brought against a private corporation. This "heads I win, tails you

12  lose" argument should not be taken seriously.

      Instead, Hart pled jurisdiction under *Free Enterprise Fund v. Public Co.*

13  *Accounting Oversight Board,* 561 U.S. 477, 491 n.2 (2010), which held that courts

14  may safeguard constitutional rights directly under the Constitution, even in the

15  absence of an explicit private right of action. Compl. ¶ 20 *bis*; *see also Bell v. Hood,*

16  327 U.S. 678, 684 (1946) ("it is established practice" to "sustain the jurisdiction of

17  federal courts to issue injunctions to protect rights safeguarded by the

18  Constitution").

19     The Defendants also incorrectly argue that Hart has not alleged any ongoing or

20  future injury. Federal Mot. to Dismiss 11, Facebook Mot. to Dismiss 7-8. Hart

21  alleged his First Amendment injury is ongoing: "Facebook and Twitter now require

22  that Hart and other users express a government-approved viewpoint to use their

23  platforms." Compl. ¶ 63. Additionally, Hart alleged future injury from Facebook in

24  Count VI, in which he alleged negligent interference with a *prospective* economic

25  advantage. Compl. ¶¶ 103-09.

26

27

28

Moreover, the Advisory has not been withdrawn and the Federal Defendants have not changed their policy of coercion or cooperation with the Social Media Defendants to censor opposing points of view. After this lawsuit was filed, Defendant Biden continued to exhort social media companies to "please deal with the misinformation and disinformation that's on your shows [sic]. It has to stop."[7] Contra the Federal Defendants' assertions, Hart continues to face a "'real and immediate threat' of future harm." Federal Mot. to Dismiss 11 (quoting *L.A. v. Lyons,* 461 U.S. 95, 102 (1983)).

## II.  Hart's California free speech count (Count III) should stand because the California Constitution is even more protective of free speech than the U.S. Constitution.

For all the reasons presented in Section I, Hart's violation of the California Constitution's free speech clause is also well pled. Indeed, the standard for applying a free speech violation to a private actor is even more liberal under the California Constitution than under the U.S. Constitution. The California Supreme Court has explicitly held that private parties violate the California Constitution's free speech clause when they prohibit individuals from speaking in their venues, when such venues are otherwise open to the public. *Robins v. Pruneyard Shopping Center,* 23 Cal. 3d 899 (1979).

In *Pruneyard*, a group of high school students set up a card table in the courtyard of a privately owned shopping center to gather signatures for a petition to the government opposing an anti-Israeli resolution at the United Nations. *Id.* at 902. Security guards informed them of the shopping center's policy against petitions and suggested they relocate to the public sidewalk at the center's perimeter. *Id.* The Court overturned a prior ruling and concluded that prior case law does not prevent

[7] *Watch: Biden delivers remarks on his administration's coronavirus response*, YouTube (Jan. 13, 2022) https://www.youtube.com/watch?v=pOowEhwlsXE, at 35:12.

1  California's constitution from "providing greater protection than the First

2  Amendment . . . ." *Id.* at 910. The Court held that Article I, Secs. 2 and 3 of the state

3  constitution protect speech even in privately owned shopping centers. *Id.* The Court

4  found that hundreds of thousands of adults in the San Jose area visited shopping

5  centers, *id.* at 907, and reasoned that because the "public is invited[, they] provide

6  an essential and invaluable forum for exercising [free speech] rights." *Id.*

7      Hart has pled a credible claim that this same reasoning applies today to the

8  internet. Because the public is invited and hundreds of millions of Americans visit,

9  social media sights also "provide an essential and invaluable forum for exercising

10  [free speech] rights" under the California Constitution even when they are privately

11  owned. *Id.*

12      Although the Social Media Defendants wish to curb *Pruneyard Shopping Center*

13  (Facebook Mot. to Dismiss, Dtk. 73 at 9; Twitter Mot. to Dismiss, Dkt. 70 at 15), the

14  Complaint points out that the U.S. Supreme Court has held that the internet is a

15  "quintessential forum." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017).

16  Congress has said the same, describing the internet in Section 230 as "a forum for a

17  true diversity of political discourse." 47 U.S.C. § 230(a)(3). California courts also

18  refer to social media platforms as fora for discussion of public issues. *Daniel v.*

19  *Wayans*, 8 Cal. App. 5th 367, 387, 213 Cal. Rptr. 3d 865 (Ct. App. 2017).

20      The Social Media Defendants insist that *Pruneyard* can apply to private

21  companies "only if the property is freely and openly accessible to the public." Twitter

22  Mot. to Dismiss 15; Facebook Mot. to Dismiss 9. Facebook argues that this exception

23  never applies to "virtual spaces," *id.*, while Twitter argues that its Terms of Service

24  distinguish it from "public streets or open air malls" and it is therefore not "freely

25  and openly accessible." Twitter Mot. to Dismiss 16. Neither argument is

26  compelling—and certainly not at this stage of the pleadings. Facebook's contention

27

28  PLAINTIFF'S COMBINED RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS AND TO
DEFENDANT TWITTER'S MOTION TO STRIKE
3:22-cv-00737-CRB

1   flies directly in the face of all the law calling social media a public forum, and

2   Twitter's terms of service are no different from the posters at the entrance to many

3   shopping malls setting rules for speech and other activities.

4         The Social Media Defendants cite *Zimmerman v. Facebook, Inc.,* No. 19-CV-4591,

5   2020 WL 5877863 (N.D. Cal. Oct. 2, 2020) for the assertion that they can *never* be

6   sued under California's free speech clause, apparently regardless of whether they

7   committed joint action with the government. Facebook Mot. to Dismiss 9; Twitter

8   Mot. to Dismiss 16. But that was not the *Zimmerman* court's holding. In fact, it even

9   acknowledged the possibility of joint action in a separate order. *Zimmerman,* No. 19-

10   CV_4591, 2020 U.S. Dist. LEXIS 183323 at *6 (N.D. Cal. Oct. 2, 2020) ("These

11   allegations of joint action between Facebook and the Trump administration . . .

12   pertain to the privacy-related claims brought in the Facebook MDL . . . .").

13         Alternatively, Facebook defends its Community Standards as "precisely the kind

14   of 'reasonable regulation' that *Pruneyard* endorsed." Facebook Mot. to Dismiss 10.

15   But the Complaint alleges that Facebook's Community Standards are *not* reasonably

16   applied. Compl. ¶¶ 27-28 (Facebook's Community Standards state that it "do[es] not

17   remove false news from Facebook" and do not "prohibit viewpoints that oppose

18   making children wear masks"), 39-40 (Facebook's standard of "false news" changes

19   based on what the government says). Whether these standards are reasonable turns

20   on the factual circumstances of their application to Hart, and that is yet to be

21   determined.

22

23   **III.    Hart has adequately pled the elements of a promissory estoppel claim
            (Count IV).**

24         The fourth count of Hart's Complaint seeks to hold the Social Media Defendants

25   liable based on promissory estoppel by alleging that they breached a "clear and

26   unambiguous promise" to him that he could use their services and that he engaged

27

28

1    in "reasonable, foreseeable and detrimental reliance" on that promise. Compl. ¶¶ 80-

2    87 (quoting *Bushell v. JPMorgan Chase Bank, N.A.,* 163 Cal. Rptr. 3d 539, 550 (Cal.

3    Ct. App. 2013) ("The elements of promissory estoppel are (1) a clear and

4    unambiguous promise by the promisor, and (2) reasonable, foreseeable and

5    detrimental reliance by the promisee.")).

6        First, the Social Media Defendants falsely argue that Hart has not pled a

7    "specific representation" made "directly to" him that they would not remove his

8    content. Facebook Mot. to Dismiss 10-11; Twitter Mot. to Dismiss 17. On the

9    contrary, Hart pled that, through its terms of service, Facebook invited him to

10   "connect with [other people], build communities, and grow [his] business[.]" *See*

11   Compl. ¶ 25. Furthermore, he pled that Facebook promised him, "[W]e do not remove

12   false news from Facebook . . . ." Compl. ¶ 26. Similarly, he pled that Twitter

13   promised him, "Twitter's purpose is to serve the public conversation." *Id*. ¶ 44

14   (quoting "The Twitter Rules"). And he pled that, by its silence on the matter among

15   other topics for removal, Twitter implicitly promised him that it does not "prohibit

16   viewpoints that oppose wearing masks . . . ." *Id*. ¶ 46. Finally, if this were not

17   enough, Hart pled explicitly, "Facebook and Twitter made 'a clear and unambiguous

18   promise' to Hart that he could use their services to communicate and network with

19   other Facebook and Twitter users." *Id*. ¶ 81 (quoting *Bushell*, 163 Cal. Rptr. 3d at

20   550). Also, they "did not caveat this promise by announcing that they would censor

21   speech opposing masks." *Id*. ¶ 82; *see also id*. ¶ 27. Thus, Hart properly pled that the

22   Social Media Defendants made a promise to him.

23       Moreover, as explained below in Section VI.B., the manner in which the Terms of

24   Service were presented to Hart is a matter of factual dispute to be determined at a

25   later stage of the proceedings.

26

27

28   PLAINTIFF'S COMBINED RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS AND TO
     DEFENDANT TWITTER'S MOTION TO STRIKE
     3:22-cv-00737-CRB

1    Second, the Social Media Defendants argue that "Plaintiff's reliance on that

2    promise to post whatever he wished would have been unreasonable." Facebook Mot.

3    to Dismiss 11; *see also* Twitter Mot. to Dismiss 18. But Hart never interpreted their

4    promises as invitations to post "whatever he wished." For example, he did not post

5    "Child Sexual Exploitation," "Violent [or] Graphic Content," "Adult Nudity," "Spam,"

6    or "Inauthentic Behavior" (Compl. ¶ 27; *see also* Compl. ¶ 45), and he did not read

7    the Social Media Defendants' promises as an invitation to post such material. Hart

8    very reasonably relied on the promise made—the definition of objectionable

9    material—to make posts that complied with the Social Media Defendants' terms,

10   which did not prohibit viewpoints opposing masking. Compl. ¶¶ 28, 45. It was the

11   Social Media Defendants' changes in policy that were unreasonable and

12   unforeseeable—not Hart's expectation that they would remain consistent. His

13   reliance was reasonable.

14       Facebook further argues that Hart's prior violations of Facebook's Terms of

15   Service and Community Standards put him on notice as to its content moderation

16   policy, and he cannot now claim ignorance of it. Facebook Mot. to Dismiss 11. But as

17   Hart explained in the Complaint, Facebook's content moderation policies "are

18   constantly shifting." Compl. ¶ 39. Hart pled that Facebook is not following its own

19   policies. *See* Compl. ¶ 27. He pled the example of Facebook removing "posts that

20   suggested the [COVID-19] virus was man-made" for over a year and a half before it

21   reversed course at the direction of President Biden. *Id*. ¶ 40. Therefore, far from

22   claiming ignorance of Facebook's content moderation policy, Hart is well-versed in

23   its inconsistent and unreasonable application. This haphazard policy does not

24   provide proper notice to anyone. Thus, Hart has properly pled a claim for promissory

25   estoppel.

26

27

28

1
2
3

**IV.   Hart's claim of intentional interference with a contractual relationship (Count V) must stand because Facebook seeks to apply an evidentiary standard inappropriate for a motion to dismiss and because Facebook misstates the law.**

4

To properly plead a claim of intentional interference with a contractual

5

relationship, Hart must allege (1) a valid contract between a claimant and a third

6

party (Compl. ¶¶ 91-92); (2) defendant's knowledge of this contract (Compl. ¶ 93); (3)

7

defendant's intentional acts designed to induce a breach or disruption of the

8

contractual relationship (Compl. ¶¶ 94-95); (4) an actual breach or disruption of the

9

contractual relationship (Compl. ¶ 96); and (5) resulting damage (Compl. ¶ 97).

10

Compl. ¶ 89 (citing *Davis v. Nadrich*, 94 Cal. Rptr. 3d 414, 421 (Cal. Ct. App. 2009)).

11

Of the five elements, Facebook takes issue with three: the existence of a valid

12

contract; the defendant's knowledge of the same; and its intent to induce a breach of

13

the contract.

14

First, Facebook argues that Hart has failed to "allege" the existence of the

15

contract (Facebook Mot. to Dismiss 12), but this is plainly false. Hart alleged that he

16

"maintains a valid employment contract with Donorbureau, LLC" ("Donorbureau")

17

and that he serves "as an Administrator on the Donorbureau Facebook account, so

18

he can post content to the site . . . ." Compl. ¶ 91-92. Thus, Hart properly pled the

19

existence of the contract.

20

Second, Facebook jumps the gun in expecting Hart to *prove* facts about

21

knowledge of the contract at the motion-to-dismiss stage. Facebook argues that

22

Count V fails because Hart "has not shown" that Facebook had knowledge of his

23

contract with Donorbureau. Facebook Mot. to Dismiss 12. But the correct standard

24

for evaluating a motion to dismiss is not whether the plaintiff has *shown* the

25

defendant's knowledge of the contract but whether he has *alleged* it. In evaluating a

26

motion to dismiss, "[w]hen there are well-pleaded factual allegations, a court should

27

28

assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft,* 556 U.S. at 679 (2009). In this case, Hart alleged knowledge of the contract, and that is sufficient. Specifically, Hart alleged that Facebook has actual knowledge of the existence of a contractual relationship between Hart and Donorbureau because it knows that Hart serves as an Administrator for the Donorbureau Facebook account. Compl. ¶ 93.

The cases Facebook cites to argue that Hart has insufficiently alleged the tort are inapposite. Facebook selectively quotes out-of-context language from *United National Maintenance, Inc. v. San Diego Convention Ctr., Inc.* 766 F.3d 1002, 1009 (9th Cir. 2014). Facebook Mot. to Dismiss 12, 9-11. *United National Maintenance* concerned facts established at a jury trial, not the sufficiency of facts alleged in a complaint. *Id.* ("For *the jury* to understand whether [plaintiff]'s performance was disrupted required the district court to determine what contractual rights [the plaintiff] possessed.") (emphasis added). Facebook's other case, an unpublished decision, is likewise unavailing, concerning the insufficiency of a record on appeal and not the allegations in a complaint. *See Bechard v. Broidy,* No. B293997, 2020 Cal. App. Unpub. LEXIS 3969, *15 (Cal. Ct. App. June 24, 2020). At the motion-to-dismiss stage, the Court may weed out only complaints with factual allegations that, *even if they are all true,* do not amount to a cause of action. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). In this case, Hart has pled sufficient factual allegations to establish the cause of action.

Third and finally, Facebook argues that Count V fails because Facebook did not have the specific intent to interfere. Facebook Mot. to Dismiss 13. That is irrelevant. As Hart pled, California law does not require that the defendant act with specific intent to interfere. Compl. ¶ 90 (citing *Davis,* 94 Cal. Rptr. at 421; *Quelimane Co. v. Stewart Title Guaranty Co.,* 19 Cal. 4th 26, 56 (1988)). Hart need only show that the

PLAINTIFF'S COMBINED RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS AND TO DEFENDANT TWITTER'S MOTION TO STRIKE
3:22-cv-00737-CRB

20

defendant knew "that the interference [was] certain or substantially certain to occur as a result of his action." *Quelimane Co.,* 19 Cal. 4th at 56 (cleaned up). This Hart has done. Compl. ¶¶ 94-95 ("Facebook . . . intended that such action would prevent Hart from doing his work as an Administrator on the Donorbureau account. . . . Facebook intentionally interfered with Hart's contract with Donorbureau . . . ."). Thus, Hart's claim should survive.

## V.   Hart's negligent interference claim (Count VI) should stand because he has alleged a prospective economic advantage.

Facebook self-servingly attempts to transform the Complaint's final count into a tort that does not exist: negligent interference with a contract. Facebook Mot. to Dismiss 13-14. But negligent interference with a prospective economic advantage, which is what Hart pled, does exist under California law. *Nelson v. Tucker Ellis, LLP,* 262 Cal. Rptr. 3d 250, 264 n.5 (Cal. App. Ct. 2020). As Hart pled, *Nelson* requires a plaintiff to allege "the existence of a valid contractual relationship between the plaintiff and a third party containing the probability of future economic benefit to the plaintiff." Compl. ¶ 100 (quoting *Nelson* at 264 n.5). Facebook argues that Hart has not pled a "prospective economic advantage" outside of his contract with Donorbureau. Facebook Mot. to Dismiss 13. But Hart alleged in his Complaint that he has a probability of future economic benefit if he successfully fulfills the terms of his Donorbureau contract. Thus, he has alleged the necessary facts sustaining the elements of the claim.

## VI.   Defendants' catchall defenses fail.

### A. Section 230 is not a defense to Hart's claims.

First, Facebook and Twitter fallaciously argue that Section 230 of the Communications Decency Act, 47 U.S.C. § 230 et seq., bars all the claims against them. Facebook Mot. to Dismiss 14-17; Twitter Mot. to Dismiss 20-21. But Section

230 is a defense only against Hart's state-law claims, not against Hart's First Amendment claim, for the First Amendment trumps federal statutes. *Fed. Agency of News LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107, 1116 (N.D. Cal. 2020) ("the Ninth Circuit has not interpreted Section 230 to grant immunity for causes of action alleging constitutional violations.") (citing *Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1169 (9th Cir. 2008)); *id.* at 1119 ("the Court does not broach Count I, Plaintiffs' *Bivens* claim for violation of the First Amendment, because as discussed above, Section 230 does not immunize a defendant from constitutional claims."). Thus, Section 230 does not bar Hart's First Amendment claims as to any Defendants.

Second, Section 230 provides a liability shield only for "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable . . . " § 230(c)(2). Hart has alleged that this action was not taken voluntarily, in good faith, or upon consideration by Twitter and Facebook but rather was taken at the behest of the Federal Defendants.

This action was not taken voluntarily by the platforms but under pressure from the government. As the Ninth Circuit has recognized in another context, "The psychological atmosphere in which the consent is obtained is a critical factor in the determination of voluntariness." *United States v. Rothman*, 492 F.2d 1260, 1265 (9th Cir. 1973). "Where the consent is obtained through a misrepresentation by the government, or under inherently coercive pressure and the color of the badge, such consent is not voluntary." *Id*.

That is the situation in which Twitter and Facebook found themselves in this case. According to the White House Press Secretary, as alleged in the Complaint, senior officials of the White House were calling and telling the platforms to take

down posts like Mr. Hart's. Compl. ¶ 12. Even if the particular post in question was identified by a lower-level censor in the Surgeon General's office, the top-level direction was made at the highest levels of corporate and governmental leadership. In such a case, for a highly regulated entity like the platforms, such "inherently coercive pressure" renders their decision no longer voluntary. *Rothman*, 492 F.2d at 1265. Similarly, when platforms act jointly with the government, they do not act "in good faith." That is not to say they are acting in "bad faith" but that they are acting out of no faith at all. They are neither benevolent or malevolent but rather are acting as tools of their governmental puppeteers. Alternatively, if the platforms have a consistent pattern of suppressing similar information from political viewpoints with which they disagree, such censorship is not undertaken in good faith.

Or, put differently, this was not material "the *provider* or user considers to be" objectionable, but rather material the *government* considers to be objectionable. § 230(c)(2) (emphasis added). Section 230 protects against "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content." *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4ᵗʰ Cir. 1997). Here, the Complaint alleges it was not the platform but the government that made the determination in the first instance that the material was objectionable. Compl. ¶¶ 7-20. Facebook and Twitter did not exercise the publisher's editorial discretion; they implemented the government's editorial discretion.

One way this is seen is by asking whether the platforms would have taken the material down of their own accord but for the governmental pressure. The Defendants say in their submissions that they would have (Federal Mot. to Dismiss 12; Facebook Mot. to Dismiss 5-6; Twitter Mot. to Dismiss 9-10), but those factual allegations are outside the record for this motion. However, there is good reason to

1    believe that they would not have done so, given recent decisions from Meta's

2    Oversight Board.[8] In one of its first cases, the Oversight Board considered an

3    instance in which "Facebook [had] removed the content for violating its

4    misinformation and imminent harm rule, . . . finding the post contributed to the risk

5    of imminent physical harm during a global pandemic." *In re French user*, 2020-006-

6    FB-FBR (Meta Oversight Bd. Jan. 28, 2021).[9] The Oversight Board instructed

7    Facebook to restore the post, reasoning, "In this case, a user is questioning a

8    government policy and promoting a widely known though minority opinion of a

9    medical doctor. The post is geared towards pressuring a governmental agency to

10   change its policy; the post does not appear to encourage people to buy or take certain

11   drugs without a medical prescription. Serious questions remain about how the post

12   would result in imminent harm." *Id.* at 8.1. Hart stands in a similar stead: he was

13   questioning governmental policy on masking children and citing numerous peer-

14   reviewed studies on the topic; he was not urging people to undertake actions that

15   would lead to "imminent harm." *Id.*

16       In its second case dealing with COVID-19, the Oversight Board upheld

17   Facebook's decision to leave in place "a post by a state-level medical council in Brazil

18   which claimed that lockdowns are ineffective and had been condemned by the World

19   Health Organization." *In re Brazilian Medical Council*, 2021-008-FB-FBR (Meta

20

21   ────────────────────

22   [8] The Meta (Facebook) Oversight Board is "an independent body often described as a
     kind of Supreme Court for Facebook." "The board is an independent, court-like entity
     for appealing content decisions on Facebook-owned platforms. It's made up of 20

23   experts in areas like free expression, human rights, and journalism. Content
     moderation decisions made by Facebook and Instagram—for instance, removing or

24   not removing a particular post—can be appealed to the board once users have gone
     all the way through the company's internal review process." Donie O'Sullivan, "What

25   you need to know about the board deciding Trump's fate on Facebook," CNN.com
     (May 4, 2021), https://www.cnn.com/2021/05/04/tech/what-is-facebook-oversight-

26   board/index.html.

     [9] https://www.oversightboard.com/decision/FB-XWJQBU9A.

27

28   ────────────────────
     PLAINTIFF'S COMBINED RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS AND TO
     DEFENDANT TWITTER'S MOTION TO STRIKE
     3:22-cv-00737-CRB

Oversight Bd. Aug. 19, 2021).[10] Though the Oversight Board found that "the content contained some inaccurate information," it nonetheless concluded that the post "did not create a risk of imminent harm and should, therefore, stay on the platform." *Id*. Additionally, the Oversight Board emphasized that when Facebook encounters health misinformation, its response should be to provide a fact-check or contextual information alongside a post rather than to take down the post or suspend the user. *Id*. at 8.3.III ("Facebook should consider less intrusive measures than removals for misinformation that may lead to forms of physical harm that are not imminent," such as "referring content that comes to its attention to its fact-checking partners where a public position on debated health policy issues (in particular in the context of a pandemic) is presented . . . ."). The Oversight Board's two decisions specific to medical disinformation both provide good reason to believe that the platforms were not acting voluntarily or in good faith when they suspended Hart because a fair application of their existing standards would not have compelled his suspension. It was the U.S. Government's pressure that tipped the scales from free speech to censorship.

In sum, far from posing "the classic kinds of claims that have been found to be preempted by section 230," (Facebook Mot. to Dismiss 24 (cleaned up)), this is a unique case with a novel circumstance where the U.S. Government has leaned on platforms to censor content. This makes all the difference because, while normally broad immunity serves the purposes of Section 230 to protect publishers, *see Universal Commun. Sys. v. Lycos, Inc*., 478 F.3d 413 (1st Cir. 2007), here narrow immunity serves the purposes of Section 230 to stop governmental interference with the internet: "Section 230 was enacted, in part, to maintain the robust nature of Internet communication, and accordingly, to keep government interference in the

---

[10] https://www.oversightboard.com/decision/FB-B6NGYREK/.

1  medium to a minimum." *Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003). In

2  other words, "Section 230 is designed to keep the federal government removed from

3  the editorial decision-making process of internet companies like YouTube and

4  Google." *Newman v. Google LLC*, No. 20-CV-04011-LHK, 2021 U.S. Dist. LEXIS

5  119101, at *30 (N.D. Cal. June 25, 2021). Here we have the exact opposite: internet

6  companies are making editorial decisions at the behest of the federal government.

7  This undercuts the very purpose of Section 230, which Congress said was to see the

8  internet "flourish[], to the benefit of all Americans," "unfettered by Federal or State

9  regulation." 47 U.S.C. § 230(a)(4) & (b)(2). Thus, a narrow reading of the immunity,

10  and not a broad one, promotes one of "the [two] primary purpose[s] of Section 230":

11  "'the free exchange of information and ideas over the Internet.'" *Kifle v. YouTube*

12  *LLC*, No. 21-cv-01752-CRB, 2021 U.S. Dist. LEXIS 193604, at *8 (N.D. Cal. Oct. 5,

13  2021) (quoting *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1122 (9th Cir.

14  2003)). This Court must honor Congress's aim and the Ninth Circuit's instruction by

15  not allowing the Social Media Defendants to misuse Section 230 as a shield for their

16  tortious and unconstitutional cooperation in governmental censorship of the

17  internet.

### B. Facebook and Twitter's defenses based on their terms of service require the introduction of factual evidence not allowed at this stage of the pleadings.

20  Facebook claims its terms of service bar the promissory estoppel claim (Facebook

21  Mot. to Dismiss 10-11), and Twitter claims its terms of service bar all Hart's claims

22  (Twitter Mot. to Dismiss 21-22), but this defense fails at this stage because it

23  requires the Court to consider factual evidence not in the record. When reviewing a

24  motion to dismiss a complaint, a Court may consider only the facts contained in the

25  complaint and any matters properly subject to judicial notice. *Bozzio v. EMI Grp.*

26  *Ltd.*, 811 F.3d 1144, 1154 n.2 (9th Cir. 2016).

27

28

PLAINTIFF'S COMBINED RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS AND TO
DEFENDANT TWITTER'S MOTION TO STRIKE
3:22-cv-00737-CRB

26

The terms of service asserted by Facebook and Twitter are adhesion contracts, and their validity is determined by a factual inquiry into how they were presented to the user. "California law treats contracts of adhesion, or at least terms over which a party of lesser bargaining power had no opportunity to negotiate, as procedurally unconscionable to at least some degree." *In re Juul Labs, Inc.*, No. 20-cv-02345-WHO, 2021 U.S. Dist. LEXIS 157126, at *39-40 (N.D. Cal. Aug. 19, 2021) (quoting *Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996, 1004 (9ᵗʰ Cir. 2010), superseded by statute on other grounds). The degree to which adhesion contracts are procedurally unconscionable is determined by their presentation; for example, "*Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 466-67 (S.D.N.Y. 2017) . . . reject[ed] enforcement of [an] arbitration agreement where the "'I agree to Lyft's Terms of Service" is in the smallest font on the screen, dwarfed by the jumbo-sized pink "Next" bar at the bottom of the screen and the bold header "Add Phone Number" at the top,' all of which would mislead[ ] consumers even if the hyperlinked Terms of Service was easier to identify . . . ." *In re Juul Labs, Inc.*, 2021 U.S. Dist. LEXIS 157126, at *38. Therefore, before this Court may rule on this defense, a factual inquiry is required not only into the words used in the terms of service but also into how they were presented to Hart. Because such a factual inquiry has not yet occurred, the Court should deny the motions to dismiss at this stage.

Twitter asks this Court to take judicial notice of its terms of service, as they currently exist. Twitter Req. for Jud. Notice 1-2. But at this stage, the Court may not take Twitter's word that its current terms of service represent the terms of service *as they existed at times relevant to the complaint. See Gardner v. CafePress Inc.*, No. 3:14-cv-0792-GPC-JLB, 2014 U.S. Dist. LEXIS 173726, at *5-6 (S.D. Cal. Dec. 16, 2014) (refusing to take notice of the terms of service, stating "Documents on CafePress's website are not public documents and thus can be changed at any

moment by CafePress."). Because they can be—and are—changed on a regular basis, there must be a factual inquiry into which particular version of the terms of service were in effect at the time of Hart's relevant actions, including joining Twitter and Facebook, purchasing specific advertisements, and having specific posts removed. This factual dispute distinguishes this case from others in which courts took judicial notice of terms of service and plaintiffs did not dispute which version was in effect at a particular time. *See, e.g., O'Handley*, 2022 U.S. Dist. LEXIS 4491, at *4 n.3; *Coffee v. Google, LLC*, No. 20-cv-03901-BLF, 2021 U.S. Dist. LEXIS 26750, at *11 (N.D. Cal. Feb. 10, 2021).

Furthermore, Twitter and Facebook argue that Hart incorporated the terms of service into his Complaint by citing them. Twitter Req. for Jud. Notice 2; Facebook Mot. to Dismiss 3. But Hart disputes which version of them applies to each illegal act that Defendants took, and there is no evidence in the record of how they were presented to this specific plaintiff. For these reasons, the terms of service as noticed by Twitter are of no value in determining a motion to dismiss based on the sufficiency of the pleadings.

Finally, even if the terms of service were relevant at this stage, the motions to dismiss would still fail because the adhesion contracts are unconscionable. Unconscionability has two components, procedural and substantive. As mentioned, all adhesions contracts are "procedurally unconscionable to at least some degree." *In re Juul Labs, Inc.*, 2021 U.S. Dist. LEXIS 157126, at *39-40. In deciding the existence of procedural unconscionability, "the Ninth Circuit has 'consistently followed the [California] courts that reject the notion that the existence of "marketplace alternatives" bars a finding of procedural unconscionability.'" *In re: Yahoo! Inc. Customer Data Sec. Breach Litig.*, 313 F. Supp. 3d 1113, 1137 (N.D. Cal. 2018) (quoting *Shroyer v. New Cingular Wireless Servs., Inc.*, 498 F.3d 976, 985 (9th

1   Cir. 2007)). Therefore, without factual evidence that the terms of service were

2   presented to Hart in a fair way, the Twitter and Facebook motions to dismiss fail to

3   disprove allegations of procedural unconscionability.

4          The second part of the inquiry is into the substantive unconscionability: "The

5   substantive unconscionability inquiry looks to whether the *actual terms* of the

6   agreement create overly harsh or one-sided results." *In re: Yahoo! Inc. Customer*

7   *Data Sec. Breach Litig.*, 313 F. Supp. 3d 1113, 1137 (N.D. Cal. 2018) (emphasis in

8   original) (citing *Aron v. U-Haul Co. of Cal.*, 143 Cal. App. 4th 796, 808, 49 Cal. Rptr.

9   3d 555, 564 (2006)). In this instance, the terms of the agreement led to a violation of

10  Hart's First Amendment rights; therefore, they are substantively unconscionable, as

11  well.

12   **C. California's anti-SLAPP statute is inapplicable in federal court and
     in this case.**

13

14   Under the Supreme Court's test in *Shady Grove*, California's anti-SLAPP statute

15  is inapplicable in federal court. *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins.*

16  *Co.*, 559 U.S. 393, 398 (2010) (reaffirming *Hanna v. Plumer*, 380 U.S. 460, 471 (1965)

17  ("When a situation is covered by one of the Federal Rules,"  a federal court must

18  apply the Federal Rule, notwithstanding the existence of a conflicting state statute.).

19  Under *Shady Grove*, if a federal rule of civil procedure "answers the question in

20  dispute," then it governs—notwithstanding a state-law procedure to the contrary. *Id*.

21  In this instance, the question in dispute is whether the Social Media Defendants

22  may dismiss or strike Hart's claims by motion. Because Federal Rule of Civil

23  Procedure 12 allows them to do so and they have not challenged the applicability or

24  validity of Rule 12, it trumps California's anti-SLAPP statute. Therefore, the Social

25  Media Defendants' anti-SLAPP claim is inapplicable in this Court. *See* Twitter Mot.

26  To Strike; Facebook Mot. to Dismiss 17-19.

27

28

1

2

### 1. The Second Circuit applied the *Shady Grove* test in *La Liberte v. Reid* and held that California's anti-SLAPP statute conflicts with Rule 12 and is inapplicable in federal court.

3     The Second Circuit applied the *Shady Grove* test in a case of first impression

4 recently and held that "California's anti-SLAPP statute is inapplicable in federal

5 court because it increases a plaintiff's burden to overcome pretrial dismissal, and

6 thus conflicts with Federal Rules of Civil Procedure 12 and 56." *La Liberte v. Reid*,

7 966 F. 3d 79, 83 (2nd Cir. 2020).[11]   The court's persuasive analysis and rejection of

8 California's anti-SLAPP statute's application in federal court is instructive here.

9     In *La Liberte*, the plaintiff, Roslyn La Liberte, sued MSNBC personality Joy Reid

10 for defamation. *Id*. Reid mistakenly tweeted that La Liberte had called a 14-year-old

11 boy an invective and screamed at him that he was going to be deported. *Id*. at 84.

12 The tweet was false, but it went viral, and La Liberte received physical and

13 emotional threats as a result. *Id*. In defense, Reid filed a motion to dismiss under

14 Federal Rule of Civil Procedure 12(b)(6) and a motion to strike under California's

15 anti-SLAPP law. *Id*. at 83.

16     The Second Circuit acknowledged a circuit split as to whether anti-SLAPP

17 statutes apply in federal courts, with the Fifth, Eleventh, and D.C. Circuits holding

18 them inapplicable, *id*. at 86 (citing *Klocke v. Watson*, 936 F. 3d 240, 242 (5th Cir.

19 2019) (Texas statute); *Carbone v. Cable News Network, Inc.*, 910 F. 3d 1345, 1350

20 (11th Cir. 2018) (Georgia statute); *Abbas v. Foreign Policy Grp., LLC*, 783 F. 3d 1328,

21 1335 (D.C. Cir. 2015) (D.C. statute), and the First Circuit applying them. *Id*. (citing

22 *Godin v. Schencks,* 629 F. 3d 79, 86-7 (1st Cir. 2010) (Maine statute)). The Second

23 Circuit noted that the Ninth Circuit decision *United States ex rel. Newsham v.*

24 *Lockheed Missiles & Space Co.*, 190 F. 3d 963, 972 (9th Cir. 1999) (California

25

26 [11] Additionally, the court rejected defendant's argument that she enjoyed Section 230 immunity, a defense the Social Media Defendants have also asserted in this case, to

27 which Hart responds, *supra,* Section VI.A. *See La Liberte*, 966 F. 3d at 89.

28

statute), which had applied the California anti-SLAPP law, predated *Shady Grove* and was no longer controlling law. *Id.* at 87 (citing *Makaeff v. Trump Univ., LLC*, 736 F. 3d 1180, 1188 (9th Cir. 2013) (Watford, J., joined by Kozinski Ch. J., Paez J., and Bea, J., dissenting from denial of rehearing en banc) ("Just as the New York statute in *Shady Grove* impermissibly barred class actions when Rule 23 would permit them, so too California's anti-SLAPP statute bars claims at the pleading stage when Rule 12 would allow them to proceed.").[12]

The Second Circuit explained that under Rule 12, "'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). In contrast, the California anti-SLAPP statute "require[es] the plaintiff to establish that success is not merely plausible but probable." *Id.* (cleaned up). The court found that the California anti-SLAPP statute "establishes the circumstances under which a court must dismiss a plaintiff's claim before trial, a question that is already answered (differently) by Federal Rules 12 and 56." *Id.* Thus, it concluded "federal courts must apply Rule 12 and 56 instead of California's special motion to strike." *Id.* at 88.

This Court should follow the reasoning of *Shady Grove* and *La Liberte* to deny the Social Media Defendants' motions to strike under the California anti-SLAPP law. In addition, it should deny their requested relief of attorneys' fees because California's anti-SLAPP statute "does not purport to make attorney's fees available to parties who obtain dismissal by other means, such as under Federal Rule 12(b)(6)." *La Liberte*, 966 F. 3d at 88; *Abbas*, 783 F. 3d at 1337 n.5; *see also Klocke*, 936 F. 3d at 247 n.6.

---

[12] In the underlying opinion, the Ninth Circuit panel reversed the denial of the anti-SLAPP motion and held the nonmoving party was a limited public figure. The panel remanded to the district court for a determination of whether the nonmoving party could prevail on the merits of its defamation claim when it was a limited public figure. *Makaeff v. Trump Univ.*, LLC, 715 F. 3d 254, 271-72 (9th Cir. 2013).

PLAINTIFF'S COMBINED RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS AND TO DEFENDANT TWITTER'S MOTION TO STRIKE
3:22-cv-00737-CRB

31

1

2

### 2. In the alternative, if this Court applies *Planned Parenthood Federation of America*, it should still deny the anti-SLAPP motions because Hart has pled plausible claims under Rule 12.

3

In the alternative, the Rule 12 plausibility pleading standard applies even to an

4

anti-SLAPP motion when the SLAPP proponent challenges the legal sufficiency of a

5

claim. *See Planned Parenthood Fed'n of Am. v. Ctr. for Med. Progress*, 890 F. 3d 828,

6

834 (9th Cir. 2018).

7

In *Planned Parenthood*, the Ninth Circuit adopted a compromise framework in

8

which federal courts review anti-SLAPP motions to strike under different standards,

9

depending on the motion's basis. If the proponent of the anti-SLAPP motion makes a

10

legal challenge to the sufficiency of a claim, Rule 12 governs. And if the party

11

asserting the anti-SLAPP motion makes a factual challenge to the sufficiency of the

12

claim, Rule 56 governs, and the party opposing the anti-SLAPP motion is entitled to

13

conduct discovery. *Id.* at 833-34. The *Planned Parenthood* court did not address nor

14

cite *Shady Grove*, leaving the applicability of that decision an open question in the

15

Ninth Circuit.

16

Here, the Social Media Defendants rely on *Planned Parenthood* and acknowledge

17

that their anti-SLAPP motions "must be treated in the same manner as a motion

18

under Rule 12(b)(6)." Facebook Mot. to Dismiss 26; *see also* Twitter Mot. to Strike 5-

19

6. Thus, they abandon the "probability" and burden-shifting regime under

20

California's anti-SLAPP statute. Facebook Mot. to Dismiss 26; Twitter Mot. to Strike

21

6. Therefore, even under *Planned Parenthood*, the anti-SLAPP regime does not

22

apply, and the Court should deny the motions to strike under Rule 12 because Hart

23

has stated a plausible claim on which relief can be granted.

24

25

26

27

28

PLAINTIFF'S COMBINED RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS AND TO
DEFENDANT TWITTER'S MOTION TO STRIKE
3:22-cv-00737-CRB

1

2

### 3. If this Court does reach the merits of the anti-SLAPP motions, it should still deny them because they attempt to turn the statute on its head.

3   Even if this Court were to conclude that it had to apply the SLAPP standard

4   proposed by Defendants instead of the standard under the Federal Rules, this Court

5   should still conclude SLAPP does not apply on its own merits. "Analysis of an anti-

6   SLAPP motion is a two-step process. In the first step, the moving defendant bears

7   the burden of identifying all allegations of protected activity, and the claims for

8   relief supported by them. At this stage, the defendant must make a threshold

9   showing that the challenged claims arise from protected activity, which is defined in

10   Code of Civil Procedure section 425.16, subdivision (e)." *Dae v. Traver*, 69 Cal. App.

11   5th 447, 455, 284 Cal. Rptr. 3d 495 (2021) (cleaned up). In the second stage, "the

12   burden shifts to the plaintiff to demonstrate that each challenged claim based on

13   protected activity is legally sufficient and factually substantiated." *Id.*

14   The Social Media Defendants' motions do not succeed at either stage. First, the

15   moving defendants have not shown their activity of removing Hart's posts is

16   protected activity under the anti-SLAPP statute. The anti-SLAPP statute covers

17   four types of activity: "(1) any written or oral statement or writing made before a

18   legislative, executive, or judicial proceeding, or any other official proceeding

19   authorized by law, (2) any written or oral statement or writing made in connection

20   with an issue under consideration or review by a legislative, executive, or judicial

21   body, or any other official proceeding authorized by law, (3) any written or oral

22   statement or writing made in a place open to the public or a public forum in

23   connection with an issue of public interest, or (4) any other conduct in furtherance of

24   the exercise of the constitutional right of petition or the constitutional right of free

25   speech in connection with a public issue or an issue of public interest." Cal. Civ.

26   Proc. Code § 425.16(e).

27

28

PLAINTIFF'S COMBINED RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS AND TO
DEFENDANT TWITTER'S MOTION TO STRIKE
3:22-cv-00737-CRB

33

1    Here, it is Hart who made the written or oral statement in a public forum, not

2    Facebook or Twitter, so prongs 1-3 clearly do not apply. Thus, Twitter and Facebook

3    must argue that removing Hart's speech is "other conduct in furtherance of the

4    exercise of . . . the constitutional right of free speech." § 425.16(e)(4). This fails. First,

5    in the most obvious of ways, removing Hart's post is *not* an act in furtherance of free

6    speech, but an act to censor free speech.

7    Second, content moderation is not "any other conduct" as contemplated in the

8    Act. "Any other conduct" is conduct similar to an oral or written statement.

9    *FilmOn.com Inc. v. DoubleVerify Inc.*, 7 Cal. 5th 133, 144, 246 Cal. Rptr. 3d 591, 597,

10   439 P.3d 1156, 1161 (2019) ("this provision encompasses conduct and speech similar

11   to what is referenced in section 425.16, subdivision (e)(1) through (3)."). The

12   California Supreme Court has cautioned that "courts should engage in a relatively

13   careful analysis of whether a particular statement falls within the ambit of 'other

14   conduct' encompassed by subdivision (e)(4)." *Id*. at *145.

15   The term "any other conduct" was primarily intended to "shield[] expressive

16   conduct—the burning of flags, the wearing of armbands, and the like—that,

17   although not a 'written or oral statement or writing' (§ 425.16, subd. (e)(1)–(3)), may

18   similarly communicate views regarding 'matters of public significance.'" *Wilson v.

19   Cable News Network, Inc.*, 7 Cal. 5th 871, 893 (2019). "[T]he legislative history

20   suggests expressive conduct was foremost in the Legislature's thinking when

21   subdivision (e)(4) was added." *Id*.

22   However, the California Supreme Court has subsequently said that it may also

23   cover "ancillary acts alleged to facilitate a defendant's speech or petitioning rights."

24   *Id*. The question, then, is whether content censorship is an "ancillary act that

25   facilitates a defendant's speech rights." This Court should conclude that it is not.

26

27

28   PLAINTIFF'S COMBINED RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS AND TO
     DEFENDANT TWITTER'S MOTION TO STRIKE
     3:22-cv-00737-CRB

                                        34

1    That answer is evident by looking to two recent California Supreme Court cases:

2    *Wilson v. CNN* (2019) and *Bonni v. St. Joseph's Health System* (2021).

3        In *Wilson*, CNN asserted an anti-SLAPP motion against an employee who alleged

4    he'd been wrongfully terminated because of discrimination. CNN filed an anti-

5    SLAPP motion on the grounds that its termination decision was "other conduct in

6    furtherance of" its free speech rights. The California Supreme Court recognized that

7    news organizations like CNN have free speech rights to report the news with their

8    editorial judgment and that this reporting and judgment are exercised through

9    employees, such that "the decision to hire or fire an employee who is vested with

10   ultimate authority to determine a news organization's message" may rise to other

11   conduct that facilitates CNN's speech. *Wilson*, 7 Cal. 5th at 896. Because CNN did

12   not show that Wilson was such an employee, the anti-SLAPP motion failed.

13       *Wilson* teaches that organizations can discipline the individual bearers of their

14   corporate message. But no one here thinks Hart is bearing Facebook or Twitter's

15   organizational message. Facebook and Twitter are public fora that host a variety of

16   viewpoints, including many viewpoints in direct conflict with one another. In this

17   instance, they are not organizational speakers who are entitled to rely on employees

18   to effectively communicate their institutional message like a corporation,

19   government, or religious institution. Instead, they are open public fora, and no one

20   would attribute Hart's speech to Facebook or Twitter as the platforms'; they would

21   see only him as the speaker. *See Price v. City of N.Y.*, 2018 U.S. Dist. LEXIS 105815,

22   at *35-36 (S.D.N.Y. June 25, 2018) (noting people attribute speech to the account of

23   the commentator, not the social media account of the person whose original post is

24   being commented upon).

25       In *Bonni*, the California Supreme Court rejected a hospital's anti-SLAPP motion

26   against a doctor challenging a disciplinary decision. "[D]isciplining a doctor based on

27

28   PLAINTIFF'S COMBINED RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS AND TO
     DEFENDANT TWITTER'S MOTION TO STRIKE
     3:22-cv-00737-CRB

1   the view that the doctor's skills are deficient is not the same thing as making a

2   public statement to that effect. The latter is, or may be, speech on a matter of public

3   concern. The former is not speech at all." *Bonni v. St. Joseph Health Sys.*, 11 Cal. 5th

4   995, 1021 (2021). The court rejected the idea "that if stating a given viewpoint would

5   warrant constitutional and anti-SLAPP protection as an exercise of free speech

6   rights, the same protection should extend equally to any actions motivated by that

7   viewpoint." *Id*. The court declined the suggestion that "the suspensions advanced the

8   Hospitals' ability to speak or to petition on matters of public concern in any

9   substantial way." *Id*. at 2022.

10   That is precisely what happened here. The Social Media Defendants are arguing

11   that Hart's stating a given viewpoint means any action taken in response to that

12   viewpoint, here removing the content, is entitled to equal protection. Put differently,

13   the platforms must argue that their free speech was facilitated by removing Hart's

14   speech. These are exactly the propositions rejected in *Bonni*.

15   Third, granting Twitter and Facebook's motions would turn the anti-SLAPP law

16   on its head, undermining instead of advancing its original purpose. "The anti-SLAPP

17   law was enacted to protect nonprofit corporations and common citizens from large

18   corporate entities and trade associations in petitioning government." *FilmOn.com*

19   *Inc.*, 7 Cal. 5th at 143. Here, two large corporate entities are trying to punish a

20   common citizen who questioned the conventional wisdom of the medical and

21   governmental establishments in a social media post. In adopting the anti-SLAPP

22   law, the Legislature sought "to encourage continued participation in matters of

23   public significance." Cal. Civ. Proc. Code § 425.16(a). Permitting the platforms to

24   impose tens of thousands of dollars of legal costs on a common citizen for his speech

25   in a generally accessible public forum is the exact opposite of what the California

26   Legislature intended in enacting the anti-SLAPP law.

27

28

1    Finally, even if content censorship is itself protected speech activity, Hart has

2    demonstrated in this motion that "each challenged claim based on protected activity

3    is legally sufficient and factually substantiated." *Dae*, 69 Cal. App. 5th at 455. "In

4    this step, a plaintiff need only establish that his or her claim has minimal merit to

5    avoid being stricken as a SLAPP." *Id*. (cleaned up). "A plaintiff prevails in the second

6    step by demonstrating that the complaint is both legally sufficient and supported by

7    a sufficient prima facie showing of facts to sustain a favorable judgment if the

8    evidence submitted by the plaintiff is credited." *Id*.

9    Hart has clearly passed the threshold of "minimal merit," as demonstrated in this

10    response. Hart has shown the Complaint is legally sufficient and has provided

11    sufficient facts from the public record to sustain his Complaint. Hart will not repeat

12    his entire response brief here but incorporates it to show the sufficiency of his claims

13    to avoid being stricken as a SLAPP.

14    The anti-SLAPP law's purpose is in its name: to stop strategic litigation against

15    public participation. Hart did not bring this lawsuit to stop Facebook or Twitter's

16    participation in the public sphere. On the contrary, the Social Media Defendants

17    brought this anti-SLAPP motion as strategic litigation against *Hart's* public

18    participation. Under Hart's Complaint, Facebook and Twitter will be just as free

19    after this case as before to say whatever they wish about COVID-19, masking, or

20    Hart. He brought this case to encourage and protect public participation against

21    government censorship applied to him through corporate joint actors. For that

22    reason, the Court should deny the anti-SLAPP motions.

23

24

25

26

27

28

PLAINTIFF'S COMBINED RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS AND TO
DEFENDANT TWITTER'S MOTION TO STRIKE
3:22-cv-00737-CRB

37

1

**CONCLUSION**

2      For the foregoing reasons, the Court should deny Defendants' Motions to Dismiss

3  and to Strike.[13]

4

5  Dated: April 18, 2022                    Respectfully submitted,

6                                           /s/ Daniel Suhr
                                            Daniel Suhr (*pro hac vice*)
7                                           dsuhr@libertyjusticecenter.org
                                            James McQuaid (*pro hac vice*)
8                                           jmcquaid@libertyjusticecenter.org
                                            M.E. Buck Dougherty III (*pro hac vice*
9                                           *forthcoming*)
                                            bdougherty@libertyjusticecenter.org
10
                                            LIBERTY JUSTICE CENTER
11                                          440 N. Wells St., Ste. 200
                                            Chicago, Illinois 60654
12                                          Telephone: 312-637-2280
                                            Facsimile: 312-263-7702
13

14
                                            TYLER BURSCH, LLP
15                                          Robert Tyler (STATE BAR NO. 179572)
                                            rtyler@tylerbursch.com
16                                          Nada Higuera (STATE BAR NO. 299819)
                                            nhiguera@tylerbursch.com
17                                          25026 Las Brisas Rd.
                                            Murrieta, California 92562
18                                          Telephone: 951-600-2733
                                            Facsimile: 951-600-4996
19

20
                                            *Attorneys for Plaintiff*
21

22  [13] In the alternative, the Court should grant Hart leave to amend his Complaint. If a
    Rule 12(b)(6) motion prevails, a district court should freely grant a plaintiff leave to
23  amend the complaint "when justice so requires." Fed. R. Civ. P. 15(a). In general,
    leave to amend should be given with "extreme liberality." *Owens v. Kaiser Found.*
24  *Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001) (quoting *Morongo Band of*
    *Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir.1990)). When granting a Rule
25  12(b)(6) motion, "a district court should grant leave to amend even if no request to
    amend the pleading was made, unless it determines that the pleading could not
26  possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122,
    1130 (9th Cir. 2000).
27

28  PLAINTIFF'S COMBINED RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS AND TO
    DEFENDANT TWITTER'S MOTION TO STRIKE
    3:22-cv-00737-CRB
                                            38